**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | **Crim. No. 06-357 (CKK)** |
| KHAN MOHAMMED | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing to the Court for its consideration.

I)     Introduction

The defendant was charged in a two count superseding indictment in the District of Columbia that was returned by the grand jury on January 23, 2008. Count one charged the defendant with distributing one kilogram or more of heroin knowing and intending that it be imported into the United States. Count two charged the defendant with engaging in a drug trafficking offense knowing and intending to provide something of pecuniary value to a person or individual who has engaged or is engaging in terrorist activity or terrorism. On May 15, 2008, a jury convicted the defendant of both counts after less than two hours of deliberation.

The evidence adduced at trial reflected that Mohammed is an associate of the Taliban, an organization of extremist Muslims currently conducting an insurgent campaign to rid Afghanistan of "infidels", overthrow the current government, and install itself in power by means of force and acts of terrorism. Further, the Taliban engage in drug trafficking in order to finance the acquisition of weapons, ammunition and equipment necessary to conduct its attacks on coalition forces, the

1

Afghan government and anyone else who stands in their way. The defendant's responsibility was to coordinate attacks in Nangarhar Province on behalf of the Taliban. The evidence showed that the defendant had engaged in acts of terrorism in the past, and was actively planning future attacks. The evidence also showed that he was an experienced drug trafficker, and that money earned from that drug trafficking was used to support himself and advance the cause of the Taliban.

For all the reasons set forth herein, the Government requests that this Court sentence the defendant to a term of **life imprisonment**. Such a sentence is within the statutory maximum provided by law for this offense and would also be consistent with the defendant's "advisory" total offense level under the Federal Sentencing Guidelines. See United States v. Booker, 543 U.S. 220 (2005).

Moreover, pursuant to 18 U.S.C. Section 3553(a), this Court is authorized to fashion a sentence which reflects, inter alia, "the nature and circumstances of the offense," as well as consideration of other listed factors. In this case, a sentence of life imprisonment is an appropriate punishment for the defendant's conduct. This trial was the first ever under the narco-terror statute, and is believed to be the first of a Taliban member in the United States. A sentence of this magnitude is necessary to deter future criminal conduct by other foreign nationals, especially Taliban members, who are engaged in international drug trafficking and narco-terrorism, by sending a clear and unequivocal message that their illegal conduct will be severely punished in U.S. courts. Further, such a sentence would ensure that the defendant will not be able to harm others in the future.

II)     The Evidence at Trial Overwhelmingly Established the Defendant's Involvement in Narco-Terrorism and Drug Trafficking With the Knowledge and Intent to Send Heroin to the United States.

The defendant's arrest and ultimate conviction were the product of a three month investigation conducted by the U.S. Drug Enforcement Administration (DEA) in conjunction with Afghan law enforcement authorities between August and October 2006. The investigation included the use of a confidential source who made video and audio recordings of conversations he had with the defendant,[1] and who purchased approximately 11 kilograms of opium and two kilograms of heroin from him or with his direct assistance. As elicited at trial, the essential facts of the case are as follows:

In the summer of 2006, "Jaweed", an Afghan farmer, was living with his family in Peshawar, Pakistan due to a long term drought that had driven them from their ancestral home in Garetek Village, located in Nangarhar Province, Afghanistan. One day, Jaweed was summonsed to the home of Abdul Rahman, whom Jaweed knew from growing up in the same village. According to Jaweed, Rahman had been a member of the Taliban regime in Nangarhar Province, in charge of investigations, and had fled to Pakistan when the Taliban were ousted by the United States and its coalition partners. On meeting Rahman, Jaweed was instructed to return to his home in Afghanistan, where he was to obtain rockets to be used in an attack on the Jalalabad Airfield, a facility used by U.S. and NATO forces in Nangarhar Province. Not wanting to become involved with the Taliban or conduct such attacks, Jaweed explained to Rahman that he had no experience in such things and so wouldn't be of much help. Rahman responded by telling Jaweed that "I have another person who are [sic] there, you and him will work together." Tr. 5/9/08- p. 24, lines 15-16. That man was

_____

[1]Eleven of these recordings were admitted at trial.

identified by Rahman as Khan Mohammed, whom both men knew from Garetek village.

Fearing for his and his family's safety should he refuse, Jaweed agreed to go back to Afghanistan, intending to report the incident to the authorities upon his return there. Prior to that opportunity, however, the defendant greeted Jaweed on his arrival in the village and indicated that he had already been apprised of the mission by Rahman. While he would help Jaweed with the attack, Mohammed told Jaweed that it would be his responsibility to obtain the rockets to build up trust with the Taliban.

Shortly thereafter, Jaweed reported what happened to Colonel Latif, the police chief for the Charprahar District, where the Garatek village was located. Colonel Latif subsequently introduced Jaweed to the DEA unit located in Jalalabad, and the investigation commenced. The DEA instructed Jaweed to tell the defendant that he had acquired the rockets, equipped Jaweed with an audio recorder, and asked him to meet with the defendant to discuss his/Rahman's plans.

This initial conversation, recorded on August 18, 2006, set the tone for the rest of the investigation.[2] In it, the defendant freely admitted to prior acts of terrorism in blowing up government vehicles and shooting rockets at the police chief's office. He also expounded on his future terror plans:[3]

> 26    KM:  . . . We will continue our action in our country. Whatever we do, here are a lot of [opportunities]. We can place and explode bombs and fire missiles toward the airport.

---

[2]While particular parts are summarized in the body of this memorandum, the defendant so thoroughly expresses his disdain for "infidels" (i.e. non-believers of the Muslim faith), members of the government and those who collaborate with them, as well as his plans for assisting in their destruction, that the transcript of his conversation with Jaweed is attached in it's entirety as Exhibit A.

[3] "KM" is Mohammed and "JW" is Jaweed.

JW:    Yes

KM:    And to hit them with. This will be our Jihad and this will make us the [money] for our expenses.

JW:    What is the target of these people? The fact that they fire missiles to the airport, do they want to shoot the foreigners [Westerners] or the local people?

KM:    What they do is to kill the Americans. The Americans are infidels and Jihad is allowed against them. If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too. God willing, we and you will keep doing our Jihad.

Tr. Ex. 1A and 2A. Further, the defendant confirmed his relationship with Taliban members Abdul Rahman and Habib Zai, (formerly the sub-governor for Chaprahar District under the Taliban regime), and corroborated Jaweed's account concerning his conversation with Abdul Rahman:

KM:    God willing, when this operation is done, then I will take you and make you sit with them, with Habibzai and all the others.

JW:    I have not exchanged two words with Habibzai yet. It was Abdul Rahman who told me to get in touch with you. If it were not for the recommendation of Abdul Rahman, I would not have seen you either. He told me that you are his man, you are fully active on their behalf and he said whatever I need or whatever problem I have to get in touch with you. I said, "OK, it is alright."

KM:    Yes. . .
. . .
JW:    You and Habibzai. You, Habibzai and Qari Abdul Rahman (all three) are together in this?

KM:    Abdul Rahman, Habibzai and our word are the same. We are his people and with him we make our program [terror attack].

Frequently during later conversations, additional references were made by the defendant concerning the need to obtain rockets, meetings planned with other Taliban members, and the need to eliminate infidels.[4]

During their initial interviews of Jaweed, the DEA agents were told that the defendant had previously been involved in opium and heroin trafficking. This was later confirmed by the defendant during, among other times, the following conversation with Jaweed on September 18, 2006:

45-    JW:    ... When the guy told me about the opium, I thought of you and I said, there is no better dealer than you. Because you are experienced, you know everything about good quality and bad one, no one can pass fake stuff on you and if they don't give you good powder, they cannot pass on the bad quality on you.

46-    KM:    No, God willing, we are people of the trade.[5]

Tr. Ex. 1H and 2H. With this information, the DEA asked Jaweed to approach the defendant with a request on behalf of a "friend" to purchase opium, in exchange for a commission to be split between the two men. Over a series of conversations, the defendant agreed to act as a broker for the transaction, selecting the opium seller and negotiating on Jaweed's behalf. The issue of the commission was discussed frequently, with the defendant pleased with the prospect of earning larger

---

[4]Given the totality of the evidence, the government believes that paragraph 10 of the pre-sentence report, to which the defense objected, is an accurate reflection of the evidence that was adduced at trial – Jaweed provided evidence that Rahman was coordinating terror activities from Pakistan, and the defendant discussed having committed attacks that were sanctioned by Rahman and Zai. Further, as the defendant would tell Jaweed, "[They said] we will consult about the program [attack]. It would be according to their advice and I cannot do it unless they order me to do it. (Tr. Ex. 2A, line 54.)

[5]In other conversations, the defendant's experience in the drug trade was highlighted by his offers to obtain, at various times, "50 seyrs" (kilograms) (Tr. Ex. 2E, line 39), a "thousand seyrs" (Tr. Ex. 2D, line 208), or "[w]hatever quantity you want, we have the source, as much as you need." (Tr. Ex. 2H, line 70).

and larger commissions as their business with Jaweed's friend grew.

On September 11, 2006, the DEA provided Jaweed with $2800, and he met with the defendant at the Chaprahar Bazaar. There, the defendant negotiated with several sellers he was familiar with before settling on one.[6] The defendant then negotiated a price, and handed the seller the money for the down payment that Jaweed had given him. Three days later, the defendant led Jaweed to the seller's compound. In the video recording of that meeting, the defendant is seen inspecting various pads of opium and selecting the 11 kilograms of opium that Jaweed wanted.[7] Once the opium was weighed,[8] Jaweed handed the defendant the money, which the defendant in turn provided to the seller. The defendant then helped to carry the opium away from the seller's compound before turning it over to Jaweed.[9] The gross weight of the opium was later determined by the DEA to be 10.96 kilograms, of which 9.05 kilograms tested positive for opium.

Once the initial opium purchase had been made, the DEA then asked Jaweed to return to the defendant, telling him that the opium had been converted to heroin and sent to the west, and that his friend had future plans to send heroin to the United States. Jaweed did so in a recorded conversation on September 18, 2006. The defendant's reaction was telling:

> 21-    JW:    This opium is going abroad and all other powders
> are going abroad.

---

[6]It later became apparent that the defendant and the seller had prior opium dealings, as the two later were recorded discussing a prior deal in which the defendant had sold the seller opium that was apparently of questionably quality. (Tr. Ex. 2G, lines 11-12)

[7] Photo attached as Exhibit B.

[8] Photo attached as Exhibit C.

[9] Photo attached as Exhibit D.

22-    KM:    Good, may God turn all the infidels to dead corpses.

Tr. Ex. 1H and 2H.

At the request of the DEA, Jaweed also placed an order for heroin for his "friend", to be sent to the United States. The defendant proved to be an eager participant in such a deal, as it served the dual purpose of making money for them and furthering the jihad against Americans. As he stated in a recorded conversation on September 20, 2006:

7-    JW:    All right, is it possible to find powder?

8-    KM:    There are a lot, as much as you need I will give it to you. Two things would be done: one, as they say, the Jihad would be performed since they send it to America.

Tr. Ex. 1I and 2I.

Eventually, Jaweed ordered two kilograms of heroin, and paid the defendant $6,000 he had been provided by the DEA. The defendant returned several days later and, in a meeting at the defendant's compound, the defendant was seen on video (Tr. Ex. 1K) inspecting and then turning over to Jaweed 2 kilograms of heroin.[10] Particularly disturbing was the presence of the defendant's 4 year old son at his side during the majority of the transaction.[11] This substance was subsequently analyzed by the DEA, which confirmed that it was heroin in the amount of 1.981 kilograms.

The defendant was arrested on October 29, 2006.

The trial on this matter was held between May 9-15, 2008. At its conclusion, the jury convicted the defendant of both counts. With respect to the narco-terror charge, the jury found that the defendant had distributed both heroin and opium for the purpose of providing something of

---

[10] Photo attached as Exhibit E.

[11] Photo attached as Exhibit F.

pecuniary value to an individual or organization engaged and engaging in terrorist activity or terrorism.

III)   Legal Analysis

A.    The Defendant's Advisory Federal Sentencing Guidelines Range Is Life Imprisonment

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that certain applications of the mandatory United States Sentencing Guidelines violated the Sixth Amendment, because they permitted the maximum allowable sentence to be enhanced based on judge-determined facts. As a remedy, the Court invalidated the statutory provision that made the federal Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus making the Guidelines "effectively advisory." Booker, 543 U.S. at 245. Nonetheless, the Supreme Court held that in the future a district court must still "consult [the] Guidelines and take them into account when sentencing." Id. at 264 (citing 18 U.S.C. §§ 3553(a)(4) & (5)). "Under this new sentencing regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'" United States v. Coumaris, 399 F.3d 343, 351 (D.C. Cir. 2005) (internal quotations omitted). The "other statutory concerns" referred to in Coumaris are expressed primarily in 18 U.S.C. § 3553(a). United States v. McCants, 2006 WL 3086883 at p.4 (D.D.C.).

The decisions which have issued since the Booker ruling have set out a procedure for the imposition of sentences with the guidelines acting only in an advisory capacity. Under these rulings, a sentencing court must first correctly determine the applicable Guidelines sentence, including any permissible departures, and then, after considering the Guidelines and all other factors in Section 3553(a), decide whether to apply the Guidelines sentence, or apply a non-Guidelines sentence. See

United States v. Eura, 440 F.3d 625, 632 (4th Cir. 2005); United States v. Crosby, 397 F.3d 103, 111-13 (2d Cir. 2005).[12]

As reflected in the Pre-Sentence Report (PSR), the defendant's Guideline range on count two is calculated using a combination of §2D1.14(a) for the base offense level (calculated using the drug amount for the underlying offense) and §3A1.4 for the specific offense characteristic.

In this case, the base offense level is **32**, corresponding to the drug equivalency combination of 1.98 kilograms of heroin (equal to 1,981 kilograms of marijuana) and 9.05 kilograms of opium (equal to 452.5 kilograms of marijuana).

With respect to the specific offense characteristic, §3A1.4 applies, as narco-terrorism falls within the definition of a federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(iv). As such, the base offense is increased by **12** levels.

Additionally, §3A1.4(b) dictates that the defendant's criminal history level shall be set at Category **VI**.

Based upon the government's calculations, the defendant's total offense level is **44.** As explained in the PSR report, a total offense level over 43 is treated as an offense level of 43, which when calculated with a criminal history Category VI, corresponds to life imprisonment. USSG, Chapter 5, Part A, Application Note 2.

---

[12] If a district court decides not to apply a Guidelines sentence, it must explain on the record its rationale for varying from the advisory sentence. See United States v. Mares, 402 F.3d 511, 519 (5th Cir.); Crosby, 397 F.3d at 116. The final sentence will then be subject to review by the Court of Appeals for "reasonableness." Booker, 543 U.S. at 261-262.

B.      The Factors Set Forth In 18 U.S.C. Section 3553(a) Support of A Sentence of Life Imprisonment.

As the jury found that the amount of heroin the distributed by the defendant was one kilogram or more, the defendant's conviction on count two carries with it a mandatory minimum sentence of twenty years incarceration and a maximum sentence of life. See 21 U.S.C. Section 960a(a) (". . . shall be sentenced to a term of not less than twice the minimum punishment under section 841(b)(1) of this title [10 years], and not more than life. . . ). The factors set forth in 18 U.S.C. Section 3553(a) support the conclusion that a sentence of life imprisonment is appropriate under the facts and circumstances of this case. The relevant factors include:

1.      The Serious Nature and Circumstances of This Offense

The extreme violence and insecurity that pervades life in Afghanistan is hard to understate. In 2006, the last year the defendant operated there, U.S. armed forces in Afghanistan lost 65 men and women in action, along with 400 wounded.[13] Civilian casualties as a result of insurgent activity made 2006 "the deadliest year for civilians in Afghanistan since 2001 . . . at least 669 Afghan civilians were killed in at least 350 separate armed attacks by anti-government forces in 2006." Human Rights Watch, *The Human Cost: The Consequences of Insurgent Attacks in Afghanistan*, Vol. 19, No. 6(c) (April 2007) p. 3.[14] For specific examples of violence perpetrated by the Taliban,

---

[13] U.S. Department of Defense, Defense Manpower Data Center, Data, Analysis and Programs Division, *Operation Enduring Freedom - Casualty Summary By Month*, http://siadapp.dmdc.osd.mil/personnel/CASUALTY/oefmonth.pdf . The total dead and wounded as a result of hostile action from the start of Operation Enduring Freedom through August 2, 2008 were 354 and 2,305, respectively.

[14] Available on the Web at http://www.hrw.org/reports/2007/afghanistan0407/afghanistan0407web.pdf .

we would refer the Court to the government's Motion In Limine with regard to pseudonyms, filed under seal on February 25, 2008. Further undermining the country, and posing a global threat, is Afghanistan's unquestioned position as the single greatest producer of opium in the world, with 82% of global land under poppy cultivation[15] and 92% of overall opium produced as of 2007.[16]

Measured against this backdrop, it is clear that the defendant's illegal activities as a terrorist and a drug trafficker constituted an extremely serious form of criminal conduct, particularly when, as in this case, the two activities were combined. The evidence in this case showed that the defendant's activities displayed at trial were not an isolated event; rather, they were indicative of his dedicated involvement in perpetuating the turmoil that has prevented the people of Afghanistan from living in peaceful coexistence under a stable government. Further, his conduct directly threatened the lives of American service members, their NATO coalition partners, and the DEA agents posted at the Jalalabad Airfield.

This Court is authorized by statute to impose a sentence necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. Section 3553(a)(2)(A). The illegal conduct committed by the defendant clearly supports the sentence sought by the government in this case.

---

[15] UNITED NATIONS OFFICE ON DRUGS AND CRIME, *2008 World Drug Report* at 37, http://www.unodc.org/documents/wdr/WDR_2008/WDR_2008_eng_web.pdf.

[16] Id. at 40.

2.    The Need For Deterrence

The federal sentencing statute also provides that the punishment should afford "adequate deterrence" of criminal conduct. 18 U.S.C. Section 3553(a)(2)(B). Three facts are relevant in discussing deterrence. First, this is the first conviction in the nation under the narco-terror statute, and what is believed to be the first conviction in a U.S. court of a member of the Taliban, particularly relating to drug trafficking. Given this, it is expected that this case and the Court's sentence will be reported widely in the media, particularly in Afghanistan.

Second is Afghanistan's prominence in the production of opium and heroin. As evident from an examination of the transcripts introduced at trial, drug production and trafficking are so commonplace that they are discussed and conducted in barely disguised terms. Further, respect for law enforcement is such that it is seen at best as an inconvenience rather than a reason to cease criminal activity.

The third factor, as testified to by Special Agent-In-Charge Edward Follis, called as an expert at trial, is that the Taliban has taken on a central role in every stage of opium/heroin production and transportation, relying on it as a principal source of funding for its activities. More to the point, he stated that ". . . I would be able to represent that the vast majority of our cases, certainly over 50 percent, had a definitive Taliban dimension." Tr. 5/14/08- p. 20, lines 22-24. This opinion is similar to that arrived at by the United Nations, which determined that "opium cultivation in Afghanistan is now closely linked to insurgency." United Nations Office of Drugs and Crime, *Afghanistan Opium Survey 2007* (October 2007) at iii.[17] Reviewing the historical relationship between the Taliban and opium, the agency concluded that:

---

[17]Available at http://www.unodc.org/pdf/research/Afghanistan_Opium_Survey_2007.pdf.

> . . . the Taliban are again using opium to suit their interests. Between 1996 and 2000, in Taliban controlled areas 15,000 tons of opium were produced and exported – the regime's sole source of foreign exchange at that time. In July 2000, the Taliban leader, Mullah Omar, argued that opium was against Islam and banned its cultivation (but not its export). In recent months, the Taliban have reversed their position once again and started to extract from the drug economy resources for arms, logistics and militia pay.

Id. at iv.

Given all of these factors, the sentencing of this defendant presents the Court with the opportunity to send a clear message to the Taliban and other drug traffickers in Afghanistan, as well as narco-terrorists world-wide: the punishment for sending heroin to the United States from abroad, and using the proceeds from drug trafficking to finance terrorist activity, is significant.

3.    Protection of the Public from Further Crimes of the Defendant.

It is plain from the evidence introduced at trial that the defendant is intent on causing as much harm to Americans and others as possible, and that his intent was not limited to the plan to attack the Jalalabad Airfield. Throughout the trial the Court heard, from the defendant's own mouth, evidence of his hatred for all those who are non-believers in the Islamic faith (Americans in particular), those who "occupy" Afghanistan, and those who collaborate with them. In addition to the examples cited above in section II, the Court and jury heard the defendant say the following:

> . . . So we will attack if we could. If not, then we will hide ourselves and return home with no worry. We will have to attack them and then happily we will return. God willing, we will take it [the place] back from them, these are infidels and we have to eliminate them. Look, make sure that you don't let anyone know this. It is something only between the two of us.

Tr. Ex. 2A, line 38;

> If we don't get rid of infidels, this would be a great obstacle in our country. We will continue our jihad, jihad is allowed religiously

14

> against the infidels and if a Muslims [sic] is on their side and get shot, the hell with him. . .

Tr. Ex. 2A, line 80;

> Once we speak to them, then, goodness, we will set the program [attack]. You work and we will do the work. The infidels need to be killed.

Tr. Ex. 2C, line 48;

> May God eliminate them right now, and we will eliminate them too. Whether it is by opium or by shooting, this is our common goal. . .

Tr. Ex. 2H, line 36.

Of equal concern is the fact that the defendant operated surreptitiously, using his position as a village elder and a Non-Governmental Organization (NGO) employee as a cover to allay suspicion as he carried out acts on behalf of colleagues forced into exile in Pakistan. As the defendant himself explained to Jaweed,

> It is good for my credibility to be with NGO, I mean not to be suspected. Every person say that he is busy with his work and that is why I have involved myself with it.

Tr. Ex. 2B, line 66. Thus, even if the defendant were to express contrition for his conduct at this point (something he has never done previously), it would be impossible to judge the sincerity of his words.

Given the defendant's single-minded focus on eliminating perceived enemies, to permit him out of prison to return to Afghanistan would be to subject all those who support a free and democratic Afghanistan -- westerners and Afghans alike -- to substantial danger.

IV)    Conclusion

At its heart, this case vividly demonstrated the character of two men. One man, tired of his country being torn apart by years of war and strife, stood up at great risk to himself and his family to do the right thing- expose a terrorist and drug trafficker to authorities and help them bring that man to justice. The other man, out of religious fervor -- or worse, simple greed -- chose to perpetuate the violence and drug trafficking that is plaguing the country of Afghanistan and contributing to global insecurity. The Court needs to hold the defendant to account for his choice. For all of the foregoing reasons, the Government respectfully requests that the Court impose a sentence of life imprisonment.

Respectfully submitted,

WAYNE C. RAABE, Acting Chief
Narcotic and Dangerous Drug Section

Matthew Stiglitz
Julius Rothstein
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., NW, 8th Floor
Washington, D.C. 20530
202-305-3646

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was delivered to all parties via ECF on this 26th day of August, 2008.

Matthew Stiglitz

16