**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>)<br>)<br>**v.** )<br>)<br>**KHAN MOHAMMED** )<br>)<br>) | **Criminal  No.: 06-357(CKK)** |

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, Khan Mohammed, through undersigned counsel, respectfully submits his

memorandum in aid of sentencing.

**PROCEDURAL BACKGROUND**

On December 13, 2006, Mr. Mohammed was charged by a grand jury in a one count

indictment with Distribution of One Kilogram or More of Heroin intending and knowing that the

Heroin will be unlawfully imported in the United States in violation of 21 U.S.C. § 959, 960,

Aiding and Abetting in violation of 18 U.S.C. § 2.  The indictment charged that Mr. Mohammed

committed the charged offense on or about October 18, 2006.  On October 29, 2006, Mr.

Mohammed was arrested by Afghani authorities in Nangarhar Province, Afghanistan.  From

October 29, 2006 until some time in early November 2007, Mr.  Mohammed was detained in

Bagram Airbase in Afghanistan.  Thereafter he was transferred to the United States and was

presented for his initial appearance on November 5, 2007 before Magistrate Judge Alan Kay.

After Mr. Mohammed rejected a plea to the one count indictment, the government

secured a superceding indictment adding a second count of distribution of heroin and opium

knowingly or intending to provide anything of pecuniary value to a person or organization

engaged in terrorist activities in violation of 21 U.S.C. § 960(a), 841(a), 841(b)(1)(A)(I) and 18

U.S.C. § 2.  On May 9, 2008, Mr. Mohammed began a jury trial on the charged offenses.  On

May, 15, 2008 the jury returned guilty verdicts on both counts of the indictment.  Mr.

Mohammed is scheduled to appear for sentencing on October 10, 2008.

Mr. Mohammed will appear before the court to be sentence for a criminal conviction for

the first time in his life.  Mr. Mohammed requests that the Court impose a sentence of twenty

years.  A minimum mandatory sentence of twenty years is required by count two of the

indictment.  Count one mandates a minimum mandatory sentence of ten years.  The Court has

discretion to impose a concurrent sentence and there is no statutory mandate that the sentences

are to be served consecutive to one another.  Finally, because the guidelines are no longer

mandatory, a sentence of twenty years of incarceration would satisfy the statutory requirement

that the sentence be sufficient but not greater than necessary.

**I**        **REVISED OBJECTION TO THE PRE-SENTENCE INVESTIGATION REPORT**[1]

a.        **Mr. Mohammed Objects to the PSR's Offense Level Computation relating to the 12 point enhancement pursuant to U.S.S.G. §3A1.4.**

USSG §3A1.4 provides for a twelve level enhancement when a defendant has been

convicted of felony that involved or intended to promote a "federal crime of terrorism."  The

Probation Officer in her Pre-Sentence Report applies this enhancement with no explanation other

than that "the offense is a felony that involved, or was intended to promote, a federal crime of

---

[1]        Previously, counsel filed a minor none material objection to the Pre-Sentence Investigation Report. However, a more thorough review of the case law regarding the Probation Officer's enhancement pursuant to U.S.S.G. § 3A1.4. suggest that the enhancement does not apply to the facts of Mr. Mohammed's case.

terrorism." PSR at ¶ 31.    A federal crime of terrorism is defined by 18 USC § 2332b.  To apply the terrorism enhancement, the government has to prove that 1) Mr. Mohammed committed one of the enumerated crimes in §2332b, and 2) that Mr. Mohammed had the required motivation set forth in §2332b(g)(5)(A), namely, that his actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." US v. Awan, 2007 WL 2071748 at 4 (E.D. N.Y. 2007).  See also U.S. v. Graham, 275 F.3d 490, 517 (6th Cir. 2001) (district court must conclude that the crimes "satisf[ied] the elements of §2332b(g)(5)(A) and support its conclusions by a preponderance of the evidence with facts from the record."); U.S. v. Leahy, 169 F.3d 433, 446 (7th Cir.1999) (vacating sentence where district court used § 3A1.4 as an analogous sentencing factor for possession of a deadly toxin in violation of 18 U.S.C. § 175(a), because there was "absolutely no evidence in the record that Leahy sought to influence or affect the conduct of the government").

21 USC §960a is one of the enumerated crimes that potentially lead to the terrorism enhancement under §2332b(g)(5)(B)(iv).[2]  The motivational element of  USSG §3A1.4 is less clear.  In order to apply the sentence enhancement, the court would have to be convinced that Mr. Mohammed's drug sales and subsequent pecuniary aid was motivated by a desire to influence or retaliate against the United States government or some foreign government.  Offering pecuniary aid to a terrorist organization does not necessarily demonstrate such intent.  In Awan, the district court held that the defendant should not receive the sentence enhancement even after being convicted of materially aiding a terrorist organization.  The court acknowledged that the evidence

---

[2]Section 1010A of the Controlled Substances Import and Export Act (relating to narco-terrorism) is the same as 960a.

established that the defendant provided funds to a terrorist organization and knew what they would likely do with those funds, but declared that the particular motive of the defendant was speculative.  The court suggested that "private purposes," such as the emotional benefits the defendant got from associating with the influential and prestigious terrorist leaders, were the real motivation behind his material assistance, and that this motivation did not qualify him for the sentence enhancement.  Awan, at 4  Without being convinced of the defendant's motives, the court could not apply the sentence enhancement to the conviction of materially aiding a terrorist organization.

Likewise, in U.S. v. Chandia, the Fourth Circuit declared that a Pre-Sentence Report stating that the terrorism enhancement applied to a defendant who had been convicted under the material support statute erroneously assumed that the USSG §3A1.4 enhancement automatically applied to a material support conviction.  U.S. v. Chandia, 514 F.3d 365, 376 (4th Cir. 2008). The Pre-Sentence Report needed to contain factual assertions, and the district court needed to make factual findings related to the intent element.  The court vacated the sentence, remanding for resentencing, because there had been no factual finding on the intent element, and because the basic facts supporting the conviction did not give rise to an automatic inference of the required intent.  Id. at 376.

In order to apply the terrorism enhancement of USSG §3A1.4, the court will have to make extensive factual findings regarding the motivation of Mr. Mohammed.  The government will have to demonstrate by preponderance of the evidence or clear and convincing evidence that Mr. Mohammed intended to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct through his delivery of the opium and heroin

Separate and apart from the preceding objection, Mr. Mohammed objects to the "terrorism" enhancement under 3A1.4(a). This judicial sentencing enhancement will violate Mr. Mohammed's right to trial by jury under the Sixth Amendment. Blakely v. Washington, 542 U.S. 296 (2004); Ring v. Arizona, 536 U.S. 584 (2002); and Apprendi v. New Jersey, 530 U.S. 446 (2000).  In addition, the double application of a "terrorism enhancement" for both offense level and criminal history violates Mr. Mohammed's constitutional right to due process, to equal protection, and to be free from cruel and unusual punishment under the 5th and 8th Amendments. Accordingly, Mr. Mohammed should be classified under Criminal History Category I.

II.     **PURSUANT TO UNITED STATES v. BOOKER, 18 U.S.C. § 3553(a), AND 28 U.S.C. 991(b)(1)(B), A SENTENCE OF TWENTY YEARS IS AN APPROPRIATE AND REASONABLE SENTENCE UNDER THE ADVISORY GUIDELINES.**

In United States v. Booker, the Supreme Court held that the mandatory sentencing guidelines were unconstitutional as applied. 125 S. Ct. 738 (2005)  The Court further held that judges are required to "take account of the Guidelines together with other sentencing factors," and to "consider" the guidelines along with all the other required factors (emphasis added).  The Court is not bound by the guideline range and there is no requirement that a sentence be within the guideline range.  The guideline range is just one factor to be considered along with the mandatory statutory factors delineated in 18 U.S.C. § 3553(a). See  U.S. v. Pickett, 475 F.3d 1347, 1352 (D.C. Cir. 2007) ( "One, but only one, of the factors a sentencing court must also consider is the sentencing range under the Guidelines.")

Those factors  include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with the needed educational or vocational training, and pertinent policy statements issued by the

sentencing commission, and the need to avoid unwarranted sentencing disparities among similarly situated defendants. U.S. v. Clifton Price 409 F.3d 436, 442 (D.C. Cir. 2005) Moreover, Sentencing Courts have a continuing duty to "[w]eigh the purposes of sentencing listed in the Sentencing Reform Act." U.S. v. Jabber 362 F.Supp.2d 365, 369 (D. Mass. 2005).

The "starting point and initial benchmark" in sentencing determinations are the United States sentencing guidelines. Gall v. United States, 128 S. Ct. 586, 596 (2007)  However, the "Guidelines are not the only consideration," and the court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id. The Court "must make an individualized assessment based on the facts presented," and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." Id. at 597.  If the Court decides on an outside-guideline sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. [3]

The primary purpose of the sentencing statute, 18 U.S.C. 3553(a), is for the sentencing court to impose a sufficient sentence, but not one that is greater than necessary.  In Kimbrough v. United States, 128 S.Ct. 558 (2007), the Supreme Court spoke directly to this issue in holding

---

[3]      In United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the Court explained that district courts should now engage in a three-step sentencing procedure in light of Booker. First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112. Second, the court should consider whether a departure from that Guidelines range is appropriate. Id. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose. Id. at 113.

that, in light of <u>Booker</u>, a district court may deviate from the advisory Guidelines range for crack cocaine offenses based on a conclusion that the disparity between ranges for crack and powder cocaine results in a sentence greater than necessary to achieve the sentencing goals of § 3553(a). <u>Id</u>. at 564.

18 U.S.C. § 3553(a) allows the Court to take into account the particularized factors of Mr. Mohammed's life and not just the fact of his criminal conduct. This approach is consistent with the objectives of 28 U.S.C. § 991, the enabling statute of the Sentencing Commission. Both the enabling statute and the sentencing statue contemplate a flexible and particularized approach to sentencing determinations. 28 U.S.C. § 991(b)(1)(B) provides Sentencing Courts with discretion to "maint[ain] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Application of 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)(1)(B) justify the imposition of a sentence of probation of twenty years of incarceration.

### The Nature of the Criminal Offenses

Mr. Mohammed was convicted for a criminal offense that was the brain child of the agents of the Drug Enforcement Agency stationed in Afghanistan. When Mr. Mohammed was approached by Jaweed, the cooperating witness, in reference to suspected terrorist activity and attacks against the Afghan and Coalition authorities, Mr. Mohammed was not involved in drug trafficking. The government's evidence, consisting of audio and video recordings, proved as much. In fact, after it became clear that there was no evidence to support Mr. Mohammed's engagement in terrorist activities, either through planning, coordinating, or meeting with others

to plan any attacks, the government switched the nature of the investigation of Mr. Mohammed.[4]

Instead the DEA focused their investigation to whether Mr. Mohammed could be induced to

obtaining narcotics for the Jaweed's "friend"[5]. Prior to Jaweed mentioning his "friend's" need

for narcotics, Mr. Mohammed never mentioned opium or heroin. Significantly, he clearly never

mentioned narcotics as the means to carry out any attacks or to purchase the weapons for

attacking either Afghan or Coalition forces. It was only at the instructions of the DEA agents

that the subject of narcotics was introduced by the Jaweed. Even when narcotics was brought up,

Mr. Mohammed never referenced the sale of opium with the United States or with purchasing

weapons.

Once, the United States, France, and London are mentioned by the Jaweed, it is clear that

both the Jaweed and Mr. Mohammed have no knowledge of these places, their location and how

the narcotics are going to be transported to those place. Jaweed didn't know, since he was

programmed to mention the code words, which would satisfy the elements of a United States

criminal statute. Beyond stating "America" what the heroin could to Americans, there was never

any mention or discussion of how the Jaweed's "friend" was going to take the heroin to

"America," "London" or "France." After Mr. Mohammed transferred the heroin to Jaweed, there

was no evidence that Mr. Mohammed used any of his commission to purchase weapons, finance

---

[4]     Initially the DEA was concerned with a pending attack on the Jalallabad airport where the DEA along with the United States Military had a base of operations. The alleged pending attack was related to the DEA by Jaweed sometime in early August 2006. However, up until October 29, 2006 when Mr. Mohammed was arrested no planning or coordination for the "pending" attack materialized. Tr. 5/9/08 at 22, L1-3.

[5]     According to DEA Special Agent Jeffrey Higgins he "instructed [Jaweed] to gather evidence of narcotics trafficking against Khan Mohammed." Id. at 25-26.

an attack, or even to plan an attack.  As was argued by the government, Mr. Mohammed was guilty of providing material support to a terrorist or a terrorist organization because he - Mr. Mohammed - received a commission for transacting the heroin for the Jaweed's friend.

### Mr. Mohammed's History and Background

Mr. Mohammed was born in his ancestral village of Garatek Village, which is in Chaprahar District in  Nangarhar Province in Afghanistan.  Mr. Mohammed has been married to his wife Zahida for sixteen years and together they have seven children.  Prior to his arrest in October 2006, Mr. Mohammed lived with and supported his seven children, three sisters, and his mother.  Mr. Mohammed primary source of income and subsistence has been farming.  Mr. Mohammed was also a chief elder for which he received a small stipend.  As the head of the family, Mr. Mohammed was the designated person who would arrange for the welfare and marriages of his sisters and daughters.

The instant conviction will be Mr. Mohammed's first.  There is no evidence that Mr. Mohammed was previously convicted or even arrested in his native Afghanistan by Afghani authorities.  Thus, quite remarkably Mr. Mohammed stands to spend the rest of his life and die in an American prison, notwithstanding the fact that he has no criminal record, that he has never been outside of Afghanistan or the Afghan border with Pakistan.  Up until his removal from Afghanistan to the United States, Mr. Mohammed had never been outside of Afghanistan and border area of Pakistan.

The government makes bold but unsubstantiated assertions regarding Mr. Mohammed's personal history. According to the government, Mr. Mohammed is not only a terrorist but he is also a drug trafficker.  But aside from Mr. Mohammed's statements that he was involved in

attacks and had access to weapons, the government never produce and will never produce any evidence demonstrating that Mr. Mohammed was involved even in a single attack.  For all the talk of attacks and weapons, the government did not introduce a single piece of evidence, not even a photograph of the aftermath of an attack.  A search of Mr. Mohammed's house resulted in the recovery of a single kalashnikov rifle.

### The sentence should reflect the seriousness of the offense

A twenty year sentence, served in the United States, that will likely be served in the Bureau of Prison's Super Maximum Facility in Florence, Colorado will serve to provide just punishment and instill respect for the law.  Placement in the Florence, Colorado will mean that Mr. Mohammed will be detained in a single cell and locked down for twenty-three hours of the day.  Sadly, the transition to twenty-three hour lock down will, in fact, be marginal from what he has been subjected to during his incarceration in the District of Columbia Detention Facility.  A sentence of 240 months of incarceration will be a constant reminder of the gravity of his criminal conduct.  The statutory directive that the sentence should reflect the seriousness of the offense is satisfied with a twenty-year sentence for a first time offender who has been removed from everything that is familiar to him. Seen in this light, 240 months of incarceration would be a sufficient sentence that is not "greater than necessary."

### The sentence should afford adequate deterrence to criminal conduct

A sentence that removes Mr. Mohammed from his wife, children, village, country and religion for 240 months, will adequately eliminate his participation in associating with terrorists and procuring narcotics for individuals who supposedly want to send it out of Afghanistan.  If he receives a prison sentence of twenty years, Mr. Mohammed will be in his late fifties when he

returned to Afghanistan.  For someone who had never been outside of the immediate area of his province and the border area of Pakistan, twenty years of isolation, that includes cultural, religious and language isolation, it will be a miracle if Mr. Mohammed is of sound mind when he is released.

Viewed in this historical and factual context, it's hard to conceptualize how the public needs to be protected from Mr. Mohammed's drug trafficking after a twenty-year prison sentence.  While he stated that he hoped that the heroin would turn the Americans into "corpses," there was never any realistic possibility that the heroin would end up in the United States, France or London.  Moreover, there is no evidence, and none will ever be produced, that Mr. Mohammed at some point was behind, instrumental, participated or conspired to send drugs to America.  The fundamental question is,  what is the criminal conduct that Mr. Mohammed has presented to the American public that only a life sentence will provide the necessary protection?  Is the conduct the heroin transaction that came up as a result of the DEA's sting operation and without any remote possibility that the heroin would ever leave Afghanistan? Or is the conduct, the armed attacks that never materialized and which were ignored in place of a drug sting?  Clearly, neither criminal incident commiserates with a sentence of life imprisonment in the United States.

### The sentence should provide the most effective rehabilitation treatment

18 U.S.C. § 3553(a)(2)(D) directs the Court to consider Mr. Mohammed's sentence in light of the educational or vocational training that will support his rehabilitation.  It's hard to imagine what vocational training or correctional treatment will be provided to Mr. Mohammed in Florence, Colorado.  During his stay in the District of Columbia detention facility Mr.

Mohammed has not even been able to attend religious services. Somehow the idea of Mr. Mohammed going into a room to pray with fellow Muslims has been deemed a security risk. Since he arrived in Washington, D.C. in November 2007, Mr. Mohammed's only contact with the outside world has been with his counsel and Mr. Naim Saidi. Beyond that, Mr. Mohammed has had limited contact with a case manager and two psychiatrists. The case manager and the physicians have relied on a language line in order to converse with Mr. Mohammed.

The physicians have expressed concerns that Mr. Mohammed's isolation, to the point that he cannot converse with anyone, will lead to considerable mental health deterioration. The physicians pointed out Mr. Mohammed's isolation and lack of human contact, which extends to the fact that he cannot speak with anyone, and the language that he does hear, is no more than noise. Thus, there is no reason to believe that Mr. Mohammed will receive the mental health treatment that he already needs since the rest of his life will be spent in virtual lock down.

III.    **MR. MOHAMMED IS ELIGIBLE FOR A MINOR ROLE ADJUSTMENT**

**Mr. Mohammed's Role in count one of the indictment  was Less Culpable Than that of the Unidentified Source of the Drugs**.

Section § 3B1.2(b) of the Sentencing Guidelines provides that a defendant's sentence be reduce if he was a minor participant in the offense. Application note 3 to § 3B1.2 states that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." Application note 1 to U.S.S.G. § 3B1.1 defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Where a defendant is less culpable than another participant, the Guidelines directive for a reduced sentence is "unequivocal." United States v. Mitchell, 49 F.3d

769, 785 (D.C. Cir.), cert. denied, 116 S. Ct. 327 (1995).

In this case, Mr. Mohammed agreed to procure opium first and later heroin because Jaweed convinced him that he had a "friend" who wanted to those drugs.   The opium transaction was initially conducted in the public market in full view of the undercover Afghani agents and around the corner from the main government building, or the "county office."  Mr. Mohammed had no special access to the public stalls that were set up for business by the opium traffickers[6]. Mr. Mohammed's bargaining at the public opium stalls is worlds removed from the international negotiations for sizeable shipments of drugs and payment on credit involved in cases that have come to define the war on drug from cases that emanate in Colombia, Mexico, Guatemala, Panama, and Nigeria. [7]

Later when Mr. Mohammed obtains the heroin for Jaweed and his "friend" its clear that he had to go out of his way to find the narcotic.  He certainly did not have it in his compound, and there is no evidence that he was part of an organization that cultivated poppies, processed the poppies into opium or heroin.  In short, no evidence was introduced that Mr. Mohammed had access to such large amounts of drugs independently of knowing whom in Nangarhar Province could supply those amounts.  Moreover,  Mr. Mohammed only handled the drugs and money in a limited and tangential way - to give the drugs to Jaweed who would then turn them over to his "friend," DEA Special Agent Higgins.  A two-point minor role adjustment results in a corresponding reduction of two additional two points pursuant to U.S.S.G. § 2D1.1. (a) (3).

---

[6]        Inexplicably the opium traffickers who ply their illegally trade openly in the town public market did not raise even a passing concern to Haji Lateef or the DEA stationed in Jalallabad.

[7]        Undersigned counsel has attached exhibits A through E to emphasize this point.

## IV. APPLICABLE DEPARTURES UNDER THE GUIDELINES

A sentencing court may depart from the applicable Sentencing Guideline range if it finds "that there exists a... mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. 3553(b); See also U.S.S.G. Ch. 1., Pt. A, 4(b); U.S.S.G. § 5K2.0

### A. Mr. Mohammed Is Entitled To A Departure Based on Sentencing Entrapment

The Sentencing Guidelines recognize one form of sentencing entrapment as a basis for downward departure. Application Note 15 to § 2D1.1 provides that in reverse sting operations, a downward departure may be appropriate where government agents sell drugs to unwary defendants at lower than market prices, thus enticing them to purchase more drugs than they might otherwise buy, and raising their offense levels. More broadly speaking, sentencing entrapment occurs whenever a defendant who is predisposed to commit a particular type of illegal activity (thus eliminating entrapment as a defense at trial) is nevertheless persuaded by government agents to engage in relevant conduct in which he would otherwise not have been predisposed to engage, or to a greater extent than he might otherwise, exposing him to harsher punishment.

In United States v. Searcy, 233 F.3d 1096 (8th Cir. 2000), the Court held that a defendant need not demonstrate outrageous government conduct to prove sentencing entrapment. All that must be shown is that, but for certain government conduct, a defendant would not have been predisposed to commit certain relevant conduct.  The question is not whether a defendant meets the criteria of being entrapped for sentencing, but whether the facts of the case present a

14

"mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission."

"Sentencing entrapment or sentence factor manipulation occurs when a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment." United States v. Staufer, 38 F.3d 1103, 1106 (9th Cir. 1994) (internal quotation marks and citation omitted); United States v. Castaneda, 94 F.3d 592, 595 (9th Cir. 1996) (a finding of sentencing entrapment permits the court to exclude from consideration the greater quantity of drugs attributable to the entrapment and to reduce the sentence below the mandatory minimum); See also United States v. Shepard, 4 F.3d 647, 649 (8th Cir. 1993) ( Sentencing manipulation focuses on "whether the government stretched out the investigation merely to increase (the defendant's sentence)"

In the instant case DEA Special Agent Higgins orchestrated two undercover drug deals. Morever, he effectively determined the type and quantities of narcotics.  First he requested opium and later heroin, using large sums of money to induce Mr. Mohammed into procuring the two drugs for Jaweed's "friend."  More contrived was the DEA's training of Jaweed into parroting the code word of "America" into the conversations as the final destination of the drugs.  Thus, not only did the DEA agent shift the terrorist investigation of Mr. Mohammed into a drug sting but he did so in order to satisfy the statutory elements of the charged offense.  Prior to training Jaweed into repeating ad nauseam the word "America" in association with getting Mr. Mohammed to procure drugs, the DEA had no criminal case against Mr. Mohammed.  After receiving the opium that was transacted through the opium stalls at the public market, the DEA had their answer as to whether Mr. Mohammed could obtain drugs.  In fact, as the DEA learned

anyone could obtain opium by going to the pubic market. The operation to obtain heroin was done solely for the purposes to ensnare Mr. Mohammed with a United States criminal violation by having him respond to Jaweed's repeated references to "America."  Clearly, Mr. Mohammed was entrapped and the result is the application of a ten-year mandatory minimum and a significantly higher sentenced.

> **B.  Mr. Mohammed Is Entitled To Departure Because of the Onerous Conditions of Confinement Under Which Mr. Mohammed Will Likely Have to Serve Any Sentence Imposed by the Court**.

The Court should also depart downward pursuant to § 5K2.0 (a)(2)(B) because it is very likely that Mr. Mohammed will have to serve his sentence in administrative segregation and under far more onerous conditions than other prisoners convicted of importing heroin.  During his entire 10 months of incarceration in the District of Columbia Detention Facility, Mr. Mohammed has been subject to an order imposing a Special Administrative Measures order ["SAM "] relative to his detention by the Attorney General of the United States. The SAM has resulted in Mr. Mohammed being confined in administrative segregation and in almost total denial of contact with the outside world, including restrictions on his correspondence, visitation, and the use of the telephone. Regulations of the Bureau of Prisons permit the imposition of these same conditions of confinement by the Bureau of Prisons (BOP) upon written request of the Attorney General.  See 28 C.F.R. § 501.3.  These conditions can be imposed for an indefinite period of time, subject only to a renewed annual direction from the Attorney General.  Because it is a part of the Department of Justice, the BOP is almost certain to impose similar restraints on Mr. Mohammed during his incarceration.  In United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), this circuit held that a court may depart downward where the defendant "faces the

16

prospect of objectively more severe prison conditions" than would otherwise be the case. Restrictive conditions of confinement such as those to which Mr. Mohammed has been subjected, and to which he is likely to continue to be subjected, are not typical, can be psychologically detrimental to an inmate in the long run and may justify a reduction of the sentence that would otherwise be imposed.  See United States v. Noriega, 40 F.Supp. 2d 1378 (S.D. Florida 1999).

In addition to the Guidelines, the other factors that the district court must consider at sentencing are enumerated in 18 U.S.C. § 3553(a). Under Section 3553(a), the sentence imposed must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. The sentencing court must also consider the"history and characteristics of the defendant," as well as "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. 3553(a).

**V.     A PRISON SENTENCE OF 240 MONTHS IS CONSISTENT WITH THE CONGRESSIONAL MANDATE TO AVOID SENTENCING DISPARITY**.

 In determining the appropriate sentence, this Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6)  The life sentence requested by the government is without support when Mr. Mohammed's conduct, either the terrorism component or the trafficking,  is compared to prosecutions against trafficking organizations or political and religious groups that have waged or plotted to wage violent attacks against the United States, foreign governments, or civilians.

17

With respect to the trafficking aspect of the conviction, Mr. Mohammed submits the following cases for the Court's consideration:

a.    On February 1, 2007, the Middle District of Florida sentenced Joaquin Mario Valencia-Trujllo to forty (40) years after he was found guilty of conspiracy to import five (5) kilograms or more of cocaine into the United States, conspiracy to engage in money laundering and participating in a continuing criminal enterprise (Case No. 02-329). The evidence presented at trial alleged that Mr. Valencia- Trujillo was responsible for the importation of more than 100 tons of cocaine annually into the United States1;

b.    On April 2, 2007, the Southern District of New York sentenced Robert James Hertular to 400 months (33 1/3 years) after he was found guilty of conspiracy to import five (5) kilograms or more of cocaine into the United States, threatening to kill federal agents and obstruction of justice. (Case No. 04-009). The evidence presented at trial alleged that Mr. Hertular was responsible for the importation of ton-quantities of cocaine into the United States 2;

c.    On August 26, 2003, the Southern District of Florida sentenced Fabio Ochoa to 365 months (approximately 30 ½ years) after he was found guilty of conspiring to ship thirty (30) tons of cocaine per month to the United States from 1997 through 1999. According to the DEA, Ochoa was one of the world's most feared drug kingpins and a founding member of the Medillin Cartel, "one of the most ruthless and violent organizations the world has ever known"3;

d.    On July 10, 1992, the Southern District of Florida sentenced notorious Panamanian dictator Manuel Noriega to forty (40) years after he was found guilty of conspiring to import drugs into the United States (Case No. 88-079) – that sentence was later reduced to thirty (30) years.4 Historically, Mr. Noriega was known as one of the most brutal and corrupt

18

dictators of all time and his capture was the subject of a massive invasion by the United States; and finally

      e.      In this very district, the government recently filed a sentencing memorandum requesting a sentence of thirty-six (36) to forty (40) years for Samuel Santander Lopesierra-Gutierrez after he was found guilty of conspiracy to import cocaine. According to the government, Lopesierra-Gutierrez (a former Colombian senator) was a member of an organization responsible for the importation of multi-ton quantities of cocaine and heroin into the United States. [5] In addition, more than 3900 kilograms of cocaine were seized during the investigation of Mr. Lopesierra-Gutierrez's case.

      f.      In July of 2007, in the case of Anayibe Rojas Valderrama (Case No. 03- 554), the government requested a fifty-five (55) to sixty (60) year sentence. The government argued the defendant was a member of a "foreign terrorist organization" (U.S. Department of State designation) and engaged in drug trafficking to finance a war and to overthrow the Colombian government. However, at sentencing, the Court imposed 200-months, or 16-years and 8- months.

      Perhaps the most extreme example of sentencing disparity that would occur if the Court imposes a life sentence concerns the prosecution and sentence of Baz Mohammed.  Mr. Baz Mohammed was an Afghani heroin kingpin who led a trafficking organization and through a fifteen years period transported millions of dollars worth of heroin through and extensive and complex organization to the United States.   For his fifteen years of flooding Pakistan and the United States with his deadly narcotics, Baz Mohammed received a sentence of 188 months in prison.  It's impossible to reconcile a fifteen-year sentence with an international kingpin to Mr. Mohammed's single sale of heroin for which the government is asking that he stay and die in

American prison.[8]

### **CONCLUSION**

For the reasons stated above, regardless of the methodology or reasoning utilized by the Court, the facts of this case support the imposition of a sentence of 240 months.  Mr. Mohammed is a 38-year old defendant who had never been convicted of a crime, who had never been removed from his wife and children, and had never ventured further than the border area with Pakistan.  The sentence requested by the government is not only misguided, does not satisfy the statutory factors enumerated in 18 U.S.C. § 3553(a) and such a sentence would be unjust.

For the foregoing reasons, undersigned counsel requests that the Court sentence Mr. Mohammed to a period of incarceration of 240 months.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Carlos J. Vanegas
Dani Jahn
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[8]    Undersigned counsel has attached the Department of Justice's press release for Mr. Baz Mohammed's sentence as Exhibit C.  Counsel has attached additional press releases to demonstrate that true kingpins who have devastated the United States and their home countries with the cultivation, production, exportation and importation of illegal drugs have received far more lenient sentences than the requested sentence of life imprisonment for Mr. Mohammed.

20