**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Criminal No. 06-357 (CKK) |
| ) | |
| KHAN MOHAMMED ) | |
| ) | |
| Defendant ) | |

**<u>DEFENDANT'S MOTION TO VACATE HIS CONVICTION,</u>**
**<u>OR IN THE ALTERNATIVE FOR RESENTENCING,</u>**
**<u>BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................iii

JURISDICTION .................................................................................................2

BACKGROUND .................................................................................................2

        A.     The Alleged Drug Transactions.......................................................2

        B.     The Trial ........................................................................................3

        C.     The Appeal.....................................................................................5

        D.     The D.C. Circuit Decision ..............................................................6

STANDARD OF REVIEW ..................................................................................8

SUMMARY OF ARGUMENT ............................................................................9

ARGUMENT.....................................................................................................10

    I.     COUNSEL'S FAILURE TO CONDUCT A PRE-TRIAL
           INVESTIGATON WAS UNREASONABLE AND PREJUDICIAL..........10

        A.     Counsel's Lack of Any Pretrial Investigation Was
              Unreasonable. .................................................................................10

        B.     There Is No Explanation, Other Than Lack Of Diligence, For
              Trial Counsel's Failure To Investigate. ...........................................12

            1.     The Supposed Logistical Difficulties Were Chimerical. .......12

            2.     The Failure To Investigate Was Not A Strategic
                Decision. .................................................................................13

        C.     Trial Counsel's Lack of Pretrial Investigation Prejudiced
               Mohammed. .....................................................................................14

    II.    COUNSEL'S FAILURE TO CHALLENGE A GOVERNMENT
           WITNESS'S "INTERPRETATIONS" OF TAPED EVIDENCE WAS
           OBJECTIVELY UNREASONABLE AND PREJUDICIAL. .....................16

    III.   COUNSEL'S FAILURE TO RAISE AN ARGUMENT OF DURESS
           WAS UNREASONABLE AND PREJUDICIAL. ......................................19

i

IV.    THE CUMULATIVE EFFECT OF COUNSEL'S VARIOUS
       ERRORS RENDERED HIS ASSISTANCE CONSTITUTIONALLY
       DEFICIENT......................................................................................................21

CONCLUSION...........................................................................................................23

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Crisp v. Duckworth,
    743 F.2d 580 (7th Cir. 1984) ................................................................10

Delaware v. Van Arsdall,
    475 U.S. 673 (1986).................................................................................16

DeLoach v. United States,
    307 F.2d 653 (D.C. Cir. 1962)...............................................................17

Glover v. United States,
    531 U.S. 198 (2001)................................................................................19

Harrington v. Richter,
    131 S.Ct. 770 (2011)................................................................................8

Lindstadt v. Keane,
    239 F.3d 191 (2d Cir. 2001)...............................................................8, 22

Porter v. McCollum,
    130 S. Ct. 447 (2009)..........................................................................8, 10

*Reynoso v. Giurbino,
    462 F.3d 1099 (9th Cir. 2006) ...........................................................10, 11

*Strickland v. Washington,
    466 U.S. 668 (1984)........................................................................ passim

Tucker v. Ozmint,
    350 F.3d 433 (4th Cir. 2003) ................................................................10

United States v. Abel,
    469 U.S. 45 (1984)..................................................................................16

United States v. Barbour,
    813 F.2d 1232 (D.C. Cir. 1987)............................................................10

*United States v. Debango,
    780 F.2d 81 (D.C. Cir. 1986)................................................................14

\* Authorities upon which we chiefly rely are marked with astericks.

United States v. Ellerbe,
    372 F.3d 462 (D.C. Cir. 2004).......................................................................................19

United States v. Garcia,
    291 F.3d 127 (2d Cir. 2002)..........................................................................................17

United States v. Grinage,
    390 F.3d 746 (2d Cir. 2004)......................................................................................17, 18

United States v. Harris,
    894 F. Supp. 20 (D.D.C. 1995).....................................................................................19

*United States v. Kaplan,
    490 F.3d 110 (2d Cir. 2007)..........................................................................................17

United States v. Marquez,
    653 F. Supp. 2d 1 (D.D.C. 2009).................................................................................8, 22

United States v. McDade,
    699 F.3d 499 (D.C. Cir. 2012).......................................................................................13

United States v. Moore,
    544 F.2d 1086 (D.C. Cir. 1976)......................................................................................15

*United States v. Ortega-Mendoza,
    981 F. Supp. 694 (D.D.C. 1997)......................................................................................21

United States v. Parman,
    461 F.2d 1203 (D.C. Cir. 1971)......................................................................................12

United States v. Salem,
    578 F.3d 682 (7th Cir. 2009) ....................................................................................15, 16

United States v. Sensi,
    879 F.2d 888 (D.C. Cir. 1989).......................................................................................13

United States v. Shabban,
    612 F.3d 693 (D.C. Cir. 2010).......................................................................................14

United States v. Williams,
    358 F.3d 956 (D.C. Cir. 2004)........................................................................................8

Wiggins v. Smith,
    539 U.S. 510 (2003)....................................................................................................14

Williams v. Washington,
    59 F.3d 673 (7th Cir. 1995) ...........................................................................................14

Wood v. State of Alaska,
    957 F.2d 1544 (9th Cir. 1992) .......................................................................................16

**STATUTES**

21 U.S.C. § 959.............................................................................................................2, 3

21 U.S.C. § 960a.......................................................................................................2, 3, 7

**RULES**

Fed. R. Crim. P. 15(a)(1) ..................................................................................................13

Fed. R. Evid. 701 .........................................................................................................9, 17

Fed. R. Evid. 702 ...............................................................................................................17

**OTHER AUTHORITIES**

Antonio Giustozzi, Koran Kalashnikov and Laptop: The Neo-Taliban Insurgency in
    Afghanistan (2008) .......................................................................................................20

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Criminal No. 06-357 (CKK) |
| | ) | |
| KHAN MOHAMMED | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## DEFENDANT'S MOTION TO VACATE HIS CONVICTION, OR IN THE ALTERNATIVE FOR RESENTENCING, BASED ON INEFFECTIVE ASSISTANCE OF COUNSEL

On September 4, 2012, the D.C. Circuit rejected many of defendant Khan Mohammed's claims on direct appeal but remanded "for the district court to hold an evidentiary hearing on the claim of ineffective assistance." Opinion at 2 U.S. v. Khan, No. 09-3001 (D.C. Cir.). Mohammed hereby moves this Court to vacate his conviction, or in the alternative to order resentencing, on ineffective assistance grounds.

In support of this motion, Mohammed submits the following points and authorities to show that his trial counsel rendered ineffective assistance in three ways. *First*, trial counsel failed to interview *any* potential witnesses, even though discovery identified many such witnesses and trial counsel knew those witnesses could have information that would impeach the government's star witness. *Second*, trial counsel failed to object when that star witness repeatedly characterized Mohammed's recorded statements in prejudicial ways, in violation of the Rules of Evidence. *Third*, trial counsel failed to raise an obvious duress defense that could have mitigated Mohammed's sentence. A hearing on this motion is respectfully requested.

1

## JURISDICTION

This court has jurisdiction pursuant to 21 U.S.C. §§ 959(c) and 960a(b), on remand from the D.C. Circuit's decision on direct appeal.

## BACKGROUND

The Court is familiar with the background, so we recite it only briefly.

### A.    The Alleged Drug Transactions

Defendant Mohammed is an Afghani farmer who has lived his entire life in Garatak village in Afghanistan's Nangarhar province. Ex. 1, p. 12-13, 17 (5/9/08 p.m. Tr.). In 2006, a former Taliban official in Pakistan allegedly asked another man from Garatak, named Jaweed, to return to Afghanistan and seek out Mohammed's help to obtain missiles. Id. at 19-25. Jaweed subsequently came to the attention of United States Drug Enforcement Agency ("DEA") officials in Afghanistan. Id. at 28, 40-41; Ex. 2, p. 20-23 (5/9/08 a.m. Tr.). The DEA officials instructed Jaweed to record his conversations with Mohammed, which he did. Ex. 2, p. 23-24 (5/9/08 a.m. Tr.); Ex. 1, p. 41 (5/9/08 p.m. Tr.).

The DEA initially planned to arrange a controlled missile sale to Mohammed, but the DEA agents eventually abandoned that plan and decided instead to work with Jaweed to ensnare Mohammed in controlled narcotics purchases. Ex. 2, p. 24-26 (5/9/08 a.m. Tr.); Ex. 3, p. 17 (5/12/08 a.m. Tr.). In September and October 2006, Mohammed provided Jaweed with opium and heroin, respectively, as part of these controlled purchases. Ex. 4, p. 6-7, 18, 29–32, 34-36 (5/12/08 p.m. Tr.); Ex. 5, p. 7-9, 12-16, 20-24 (5/13/08 a.m. Tr.); Ex. 6, p. 30-32 (5/13/08 p.m. Tr.); Ex. 7, p. 75, 77-80 (5/14/08 a.m. Tr.). Many of the conversations between Mohammed and Jaweed regarding these transactions were taped. Ex. 2, p. 21-28 (5/9/08 a.m. Tr.).

As a result of these drug sales, a grand jury returned an indictment against Mohammed on December 13, 2006, charging him with distributing opium and heroin with the knowledge that it would be imported into the United States in violation of 21 U.S.C. § 959. (December 13, 2006, Indictment (Dkt. No. 1), United States v. Mohammed, Crim. No. No. 06-357). A superseding indictment, returned on January 23, 2008, also charged Mohammed with engaging in drug trafficking while knowing or intending to provide something of pecuniary value to a terrorist or terrorist organization in violation of 21 U.S.C. § 960a. (January 23, 2008, Indictment (Dkt. No. 18), United States v. Mohammed, Crim. No. 06-357).

**B.    The Trial**

The government's strategy at trial relied almost entirely on two categories of evidence: Jaweed's testimony against Mohammed, and the audio and videotapes Jaweed made at the DEA's request. Mohammed's defense thus turned in large part on undermining, or otherwise explaining away, Jaweed's testimony and the tapes. And Mohammed told his trial counsel there could be a way to do just that: "Prior to trial, Mohammed identified for his attorney certain witnesses from his village in Afghanistan who he claimed could bolster his character and impugn Jaweed's." D.C. Cir. Op. 17. Mohammed believed, and told this Court, that those witnesses "would testify that he was not part of the Taliban and that Jaweed was a thief." Id. at 18. And Mohammed asked that his attorneys bring the witnesses to the trial, a request that counsel brought to the Court's attention as early as February 25, 2008. Ex. 8, p. 14 (2/25/08 a.m. Tr.).

Trial counsel fully appreciated these witnesses' potential impeachment testimony. He told the Court he would be "filing some type of motion with respect to obtaining witnesses on behalf of Mr. Mohammed." Id. at p. 9. He went on to state that he would look into the "practical issues and the resources available to try to find" witnesses and bring them to the United States.

3

Id., at 14. Indeed, he sought and obtained several lengthy continuances, citing the need to translate audio and written discovery materials into English and to explore whether it would be appropriate to have witnesses from Afghanistan appear on Mohammed's behalf at his trial. Ex. 9, p. 29-30 (2/4/08 p.m. Tr.); Ex. 8, p. 9, 13-14 (2/25/08 a.m. Tr.). Yet in the end, trial counsel simply failed to pursue those witnesses. Brief for Appellant at 14 U.S. v. Khan, No. 09-3001, 2011 WL 4006654 (filed Sept. 9, 2011). Trial counsel never interviewed *any* witnesses on Mohammed's behalf. Id. at 27. And at a hearing before this Court, trial counsel admitted that he had no strategic reason for that choice; instead, he simply "didn't follow through." Id. at 14. Indeed, trial counsel admitted to the Court: "I feel I have been ineffective in assisting him." Id. at 26.

Trial commenced on May 9, 2008. During the trial, Jaweed testified for two full days about his discussions with Mohammed and the purchase of narcotics, among other topics. Jaweed was the only witness to verify the accuracy of the video and audio recordings the government introduced. But in fact, Jaweed did more than verify the recordings' accuracy; he also "explained the recordings and provided context for them" – context that was frequently prejudicial to Mohammed. D.C. Cir. Op. 21. For example, "Jaweed testified that when Mohammed discussed blowing up mines around 'Dagosar' and 'the Red Castle' he was referring to government cars, and that plans to 'fire missiles toward the airport,' referenced the Jalalabad airfield." Id. at 21-22 (citations omitted). "Jaweed's testimony arguably shaped how the jury understood Mohammed's words." Id. at 22. Trial counsel made but a single objection to such testimony. Ex. 3, p. 25 (5/12/08 Tr.). Nor did he attempt to put on an affirmative case of any kind to counter Jaweed's inferences.

On May 15, 2008, the jury convicted Mohammed on both counts in the indictments, and on December 22, 2008 he was sentenced to life for each count, to be served concurrently. (May 15, 2008, Verdict Form (Dkt. No. 62), United States v. Mohammed, Crim. No. 06-357 and September 4, 2012, Conviction and Sentence (Dkt. No. 109), United States v. Mohammed, Crim. No. 06-357).

### C.    The Appeal

The Court appointed Peter Spivack, a partner at Hogan Lovells US LLP, to be Mohammed's attorney on appeal.  Mohammed filed an appeal on September 9, 2011, challenging his conviction and double life sentence on various grounds, one of which was ineffective assistance of counsel. D.C. Cir. Op. 7.

During the appellate process, Mohammed's appellate counsel was readily able to contact the witnesses Mohammed had identified. Ex. 11, ¶ 9 (Desai Dec.).  Phone numbers for some of those witnesses, which Mohammed himself provided, were available in the very first pages of the discovery materials in trial counsel's possession.  Ex. 12 (Discovery KM0001–KM0005). With the help of Mohammed's nephew and a translator, appellate counsel interviewed twenty-eight Afghanistan-based witnesses by telephone, without ever having to leave the United States to do so.  Ex. 11, ¶ 9 (Desai Dec.).  Several of those witnesses provided just the sort of impeachment and credibility evidence that Mohammed had asked his trial counsel to track down. Witnesses described Mohammed as a respected man whose "status as a village leader [] earned him a place on various *jirgas*," or tribal councils. Id. at ¶ 21.  By contrast, witnesses painted a dark and violent picture of Jaweed as a criminal who nursed a long-standing grudge against Mohammed.  One witnesses described Jaweed "as a liar and an oath-breaker." Id. at ¶ 14. Multiple witnesses said Jaweed "had a poor reputation in his village and surrounding areas

because of criminal behavior and gangsterism." Id. at ¶ 13. "Numerous witnesses described him as a thief." Id. Witnesses describe multiple incidents in which Jaweed robbed people, and one incident in which he and his gang allegedly killed a child. Id. at ¶ 18. And one witness stated that Mohammed sat on a *jirga* that found Jaweed guilty of robbery, and that Jaweed vowed to get revenge. Id. at ¶¶ 16 - 17. The witness "recalled Jaweed stating that Mohammed should have ruled in his favor because Jaweed and Mohammed are from the same area." Id. at ¶ 16. He overheard Jaweed tell Mohammed: "you named me. *I will not leave you alone even if it takes 20 years.*" Id. (emphasis added).

### D.    The D.C. Circuit Decision

Mohammed's appellate counsel presented this new evidence to the D.C. Circuit in appellant's briefs. On September 4, 2012, the D.C. Circuit agreed that Mohammed's ineffective-assistance claim was sufficiently weighty to merit remand for an evidentiary hearing.

"Prior to trial," the panel wrote, "Mohammed identified for his attorney certain witnesses from his village in Afghanistan who he claimed could bolster his character and impugn Jaweed's. Mohammed's attorney admits he did not try to locate or interview any of them." D.C. Cir. Op. 17-18. The panel explained that Mohammed "now claims that these witnesses could have shown that Jaweed had a reputation as a liar and was biased against him" and that "[f]ailing to introduce their testimony prejudiced his defense . . . because Jaweed was the government's star witness, and his credibility was central to the prosecution." Id. at 18. That allegation was sufficient to require remand for an evidentiary hearing, the panel concluded. The panel found plausible the argument that trial counsel "should have made some effort to learn if the [Afghani] witnesses could undermine Jaweed's credibility in general, by testifying, for example, that he had a reputation for dishonesty or that he harbored a grudge against Mohammed." Id. at 20.

And the panel rejected the government's argument that testimony about Jaweed would not have been relevant because the government had agreed not to introduce evidence of Mohammed's alleged involvement with the Taliban. Id. at 19-20. That assertion "misse[d] the thrust of Mohammed's argument" because Mohammed's claim was broader: The Afghani witnesses could have undermined Jaweed's credibility more generally, not just with respect to his testimony about the Taliban. Id. at 20. The panel concluded that that theory, and trial counsel's reasons for not developing it, deserved to be addressed "by the district court on remand." Id.

Likewise, the panel concluded that Mohammed might be able to prove prejudice on remand. Id. at 20-22. That was so not just because the testimony of the absent witnesses could have undermined Jaweed's credibility, but also because the government depended on Jaweed to interpret their only other major category of evidence – the audio and video tapes. Id. at 22. "The prosecutor frequently stopped the recordings at trial and asked Jaweed to explain them to the jury," the panel explained. "Jaweed's testimony arguably shaped how the jury understood Mohammed's words. Without the additional information Jaweed provided that Mohammed was discussing government targets, a juror conceivably could conclude that Mohammed was violent, but not a terrorist as required to convict under § 960a." Id. at 22. That was enough to require remand to this Court for further proceedings: "Errors that have 'a pervasive effect on the inferences to be drawn from the evidence' have a greater probability of influencing the verdict, and Mohammed has raised a colorable claim that his attorney's failure to introduce evidence challenging Jaweed's credibility was such an error." Id. (quoting Strickland v. Washington, 466 U.S. 668, 695-96 (1984)).

7

## STANDARD OF REVIEW

Under Strickland, a defendant seeking to show ineffective assistance must first establish that his counsel made errors so serious that he was not functioning as the counsel guaranteed under the Sixth Amendment. See 466 U.S. at 688. To violate this prong of Strickland, counsel's representation must fall "below an objective standard of reasonableness . . . under prevailing professional norms." Id.; see also Harrington v. Richter, 131 S.Ct. 770, 787 (2011). That analysis requires a review of counsel's conduct from counsel's perspective at the time of that conduct. Id.

If a defendant establishes that his counsel's representation fell below an objective standard of reasonableness, he must then show that counsel's deficient performance resulted in prejudice. Porter v. McCollum, 558 U.S. 30, 38 (2009). The prejudice prong requires proof that counsel's errors were so serious as to deprive the defendant of a fair trial – a trial whose result is reliable. See id. Furthermore, the court "must consider the cumulative effect of counsel's errors" and not simply the seriousness of each error in isolation. United States v. Marquez, 653 F. Supp. 2d 1, 4 (D.D.C. 2009); see also Lindstadt v. Keane, 239 F.3d 191, 199-200 (2d Cir. 2001). The trial is unreliable if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. Strickland, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. at 669. In the sentencing context, likewise, the petitioner must establish a reasonable likelihood that errors ascribed to counsel affected the sentence. United States v. Williams, 358 F.3d 956, 967 (D.C. Cir. 2004).

8

## SUMMARY OF ARGUMENT

Mohammed's trial attorney rendered ineffective assistance of counsel several times over. First, trial counsel abdicated his duty to investigate by failing to interview *a single one* of Mohammed's potential witnesses, even though (i) he knew about the witnesses, (ii) he knew they might be able to impeach the government's star witness, and (iii) the witnesses were easily available by telephone. That failure was unreasonable and was not the result of any strategic decision, as trial counsel admitted. Moreover, it was highly prejudicial to Mohammed's defense. This was effectively a one-witness case; the government's case rested on Jaweed's credibility. As interviews conducted by Mohammed's appellate counsel revealed, witnesses that trial counsel failed to contact would have offered damning testimony about Jaweed, telling the jury that Jaweed was a liar and a thief who had vowed to get revenge against Mohammed at all costs. If trial counsel had performed competently, there is a substantial chance the trial's outcome would have been different.

Second, Mohammed's trial counsel failed to object when Jaweed time and again offered prejudicial interpretations of the government's other key evidence – Mohammed's own words, caught on tape and played at trial. The government's effort to have Jaweed interpret that evidence ran afoul of Rule 701. And yet trial counsel only objected once and failed to offer countervailing evidence of what the tapes meant, or even to point out to the jury that it had to rely on Jaweed's word to give any weight to the tapes. That failure, too, was both unreasonable and prejudicial.

Third, trial counsel failed to raise a duress defense that was well-supported in the record and likely would have, at the least, mitigated Mohammed's sentence.

9

These aspects of trial counsel's deficient performance, considered in isolation or together, amounted to constitutionally ineffective assistance of counsel. This Court should vacate Mohammed's conviction or re-examine his sentence as a result.

### ARGUMENT

**I.    COUNSEL'S FAILURE TO CONDUCT A PRE-TRIAL INVESTIGATION WAS UNREASONABLE AND PREJUDICIAL.**

Trial counsel's performance in this case constituted ineffective assistance first and foremost because he completely failed to interview easily-accessible witnesses who he knew could have impeached the government's key witness.

**A.    Counsel's Lack of Any Pretrial Investigation Was Unreasonable.**

Defense counsel has an absolute duty to conduct a reasonable amount of pretrial investigation. Strickland, 466 U.S. at 691; United States v. Barbour, 813 F.2d 1232, 1234 (D.C. Cir. 1987). A pretrial "[i]nvestigation may help an attorney develop or even discover a defense, locate witnesses, or unveil impeachment evidence." Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984). The obligation to investigate includes a duty to investigate possible methods for impeaching a prosecution witness. Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006); Tucker v. Ozmint, 350 F.3d 433, 444 (4th Cir. 2003). This duty "is especially pressing where . . . the witnesses and their credibility are crucial to the [government's] case." Reynoso 462 F.3d at 1113. That is why the Supreme Court has held trial counsel's representation deficient where counsel wholly failed to interview known witnesses. See Porter, 558 U.S. at 39. In Porter, counsel "did not even take the first step of interviewing witnesses" who could have provided impeachment evidence. Id. The Supreme Court explained that that decision "did not reflect reasonable professional judgment." Id.

10

Just so here. Mohammed's trial counsel wholly abdicated his duty to undertake *any* pretrial investigation of impeachment witnesses, much less a "reasonable amount." Strickland, 466 U.S. at 691. That choice was unreasonable. The government's case against Mohammed rested upon the credibility of its primary witness, Jaweed; the jury had to believe Jaweed's testimony, and his interpretation of the government's tapes, to convict Mohammed. And Mohammed informed his counsel that witnesses in Afghanistan could provide character evidence about him and Jaweed. Br. for App. at 14. Mohammed requested that his attorneys bring his witnesses to the trial, a request that counsel brought to the court's attention as early as February 25, 2008. Id.

Counsel understood the potential value of these witnesses' testimony. He even indicated that he would be "filing some type of motion with respect to obtaining witnesses on behalf of Mr. Mohammed" and that he would look into the "practical issues and the resources available to try to find" witnesses and bring them to the United States. Ex. 8, p. 12, 14 (2/25/08 a.m. Tr.). But he simply failed to pursue them. Br. for App. at 14. Nor was this a case where trial counsel could reasonably choose to abridge the pretrial investigation because he had already obtained an abundance of cumulative evidence. Quite the contrary: Mohammed had no witnesses and presented no defense at trial.

Trial counsel's decision not to seek out these witnesses was manifestly unreasonable. Jaweed's credibility was critical – indeed central – to the government's case. That made counsel's duty to investigate possible impeachment evidence "especially pressing." Reynoso, 462 F.3d at 1113.

**B.**    **There Is No Explanation, Other Than Lack Of Diligence, For Trial Counsel's Failure To Investigate.**

There is no plausible explanation, aside from a pure lack of diligence, for trial counsel's failure to investigate.

1.    The Supposed Logistical Difficulties Were Chimerical.

Trial counsel initially suggested to this Court that he had not contacted witnesses in Afghanistan because it was just too hard. The record demonstrates this assertion to be spurious. Trial counsel first claimed that the "only way of communicating" with any potential witnesses for Mohammed would "be to actually go there [to Afghanistan] . . . [and] not [to confer] telephonically." Br. for App. at 15. But phone numbers for potential witnesses were available in the very first pages of the discovery documents provided by Mohammed himself, see Ex. 12, and after trial Mohammed's new appellate counsel was able to contact witnesses by phone with the help of Mohammed's nephew. Ex. 11, ¶ 9 (Desai Dec.). Through a translator, appellate counsel interviewed *twenty-eight* witnesses based in Afghanistan without having to travel to the region. Id. ¶ 9. And as discussed infra at 15, those interviews were quite fruitful: They refuted any suggestion that Mohammed was involved with the Taliban, branded Jaweed as a liar and a robber, and raised fundamental questions about Jaweed's credibility and motives. Id. ¶ 13-14, 16-20. Trial counsel certainly could have used this list of names and telephone numbers to facilitate a pretrial investigation and develop information that could be used to impeach Jaweed. Counsel also could have used the services of an investigator in Afghanistan, an option suggested by the Court, to take witness statements for the same purpose. Br. for App. at 15. This is not a case in which the Court is asked to "engage in vague speculations about the kind of 'investigation' defense counsel might have made in addition to the prodigious efforts established by the record." United States v. Parman, 461 F.2d 1203, 1205 (D.C. Cir. 1971). Rather, the

12

record makes clear precisely what trial counsel could have uncovered with a modicum of effort and a few long distance phone calls.

Trial counsel also claimed that the complications in bringing a witness from Afghanistan to the United States for testimony "were just insurmountable." Br. for App. at 26. These supposed complications, however, do not excuse counsel from failing to conduct any pretrial investigation. Moreover, if trial counsel had identified potential witnesses, he could have raised any logistical issues with the Court and the Court could have taken steps in its discretion to help obtain the witnesses' testimony. See, e.g., Fed. R. Crim. P. 15(a)(1) ("A party may move that a prospective witness be deposed in order to preserve testimony for trial. The court may grant the motion because of exceptional circumstances and in the interest of justice."); United States v. Sensi, 879 F.2d 888, 899 (D.C. Cir. 1989) (suggesting that the court could permit depositions or issue letters rogatory for assistance when defendants cannot bring overseas witnesses to the United States).

2.    The Failure To Investigate Was Not A Strategic Decision.

Courts have sometimes refused to find trial counsel ineffective where the decision not to interview witnesses was a strategic choice. See, e.g., Strickland, 466 U.S. at 690-91; United States v. McDade, 699 F.3d 499, 501-02 (D.C. Cir. 2012) (trial counsel's decision not to interview potential impeachment witness was reasonable because counsel feared the risks posed by the impeachment testimony outweighed benefit to the client). But that is not what happened here. The court postponed the trial for approximately three months specifically so that defense counsel would have the opportunity to travel overseas to interview potential witnesses. Ex. 9, p. 22-32 (2/4/08 p.m. Tr.); Ex. 10, p. 68 (5/2/08 a.m. Tr.). Nonetheless, counsel did not undertake any pretrial investigation during that time and failed to interview any of Mohammed's witnesses.

13

On the eve of trial, Mohammed's counsel realized that he was ill-prepared and moved for a second continuance, emphasizing the need to conduct a pretrial investigation. Ex. 13, p. 3-4, 10-12 (5/1/08 p.m. Tr.); Ex. 10, p. 41-43 (5/2/08 a.m. Tr.). The Court denied that request because of trial counsel's inability to articulate any justification for why he had not yet prepared. Ex. 10, p. 43 (5/2/08 a.m. Tr.). At that hearing, trial counsel himself squarely admitted that he was representing Mohammed inadequately and that he had no strategic reason for his choices. Trial counsel stated: "I feel I have been ineffective in assisting him." Br. for App. at 26. Even more important, he stated that his failure to interview Mohammed's witnesses was neither reasoned nor strategic; instead, in his own words, he simply "didn't follow through." Id. at 38.

Trial counsel's failure to interview a single witness, in short, "stemmed from inattention, not strategic judgment." Wiggins v. Smith, 539 U.S. 510, 512 (2003). Here, as in Wiggins, that inattention "fell short of prevailing professional standards" and amounted to ineffective assistance. Id. As the D.C. Circuit has explained: "[T]he complete failure to investigate potential[] . . . witnesses . . . can hardly be considered a tactical decision." United States v. Debango, 780 F.2d 81, 85 (D.C. Cir. 1986). See also, e.g., United States v. Shabban, 612 F.3d 693, 697-98 (D.C. Cir. 2010) (refusing to investigate specific information or calling witnesses was deficient performance); Williams v. Washington, 59 F.3d 673, 679-82 (7th Cir. 1995) (counsel's failure to conduct any pretrial investigation constituted ineffective assistance where investigation could "easily have developed leads affecting the credibility issues" in the case).

## C.     Trial Counsel's Lack of Pretrial Investigation Prejudiced Mohammed.

For the reasons above, trial counsel's failure to investigate fell "below an objective standard of reasonableness . . . under prevailing professional norms." Strickland, 466 U.S. at 688. That failure likewise fulfilled the second Strickland criterion: Mohammed was prejudiced

14

by his counsel's ineffective assistance because it prevented him from undermining the government's primary pieces of evidence – Jaweed's testimony and the government's audiotapes.

If trial counsel had interviewed Mohammed's witnesses, he would have discovered compelling impeachment evidence that cast fundamental doubts on Jaweed's credibility. As set forth supra at 5-6, witnesses described Jaweed as a liar, a gangster, and a thief who had repeatedly been found guilty of robbery and whose gang allegedly had killed a child. Ex. 11, ¶ 15 (Desai Dec.). And crucially, one witness stated that Jaweed vowed to take revenge against Mohammed after Mohammed sat on a *jirga* that convicted Jaweed of robbery. Id. ¶ 16. According to the witness, Jaweed "stat[ed] that Mohammed should have ruled in his favor because Jaweed and Mohammed are from the same area," and he heard Jaweed tell Mohammed: "you named me. I will not leave you alone even if it takes 20 years." Id. at ¶ 16.

That information likely would have changed the result of Mohammed's trial. Jaweed was the government's main fact witness, and he also "explained the recordings" – the government's other primary source of evidence – "and provided context for them." D.C. Cir. Op. 21. The jury accordingly had to believe Jaweed to convict Mohammed. And it is difficult to imagine more compelling impeachment evidence regarding Jaweed's credibility than the evidence trial counsel could have presented had he done his job adequately: namely, testimony that Jaweed was a liar and a thief who swore to have revenge against Mohammed no matter how long it took. Nor is there any doubt that the witnesses' testimony about Jaweed's grudge and motive to lie would have been admissible. "[B]ias is not collateral and may be proved by extrinsic evidence." United States v. Moore, 554 F.2d 1086, 1091 n.34 (D.C. Cir. 1976); accord United States v. Salem, 578 F.3d 682, 686 (7th Cir. 2009) ("Proof of bias or motive to lie is admissible

15

impeachment evidence.") (citing <u>United States v. Abel</u>, 469 U.S. 45 (1984)).  "Indeed, exposing a witness's motive to lie is a 'core value' of the Sixth Amendment's Confrontation Clause"; that is why "a party may introduce extrinsic evidence to show it." <u>Salem</u>, 578 F.3d at 686.

If the jury had learned that the government's star witness had a deep-seated grudge against Mohammed and had vowed to get revenge, there is a reasonable probability that it would not have found Mohammed guilty beyond a reasonable doubt.  After all, as the courts have recognized, evidence demonstrating "the bias of a crucial prosecution witness" can "forcefully undermine the credibility of the witness and the strength of the state's entire case." <u>Wood v. State of Alaska</u>, 957 F.2d 1544, 1554 (9th Cir. 1992); <u>see also</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 684 (1986) (in assessing the impact that bias evidence would have had if presented to the jury, the courts must assume the damage potential of the bias evidence was fully realized).

## II.    COUNSEL'S FAILURE TO CHALLENGE A GOVERNMENT WITNESS'S "INTERPRETATIONS" OF TAPED EVIDENCE WAS OBJECTIVELY UNREASONABLE AND PREJUDICIAL.

Trial counsel's complete failure to investigate is sufficient, standing alone, to amount to ineffective assistance and require a new trial.  But trial counsel also was deficient in a second, separate respect:  He failed to object when the prosecution repeatedly elicited from Jaweed interpretations of Mohammed's taped statements.  That failure was unreasonable because, as we explain below, Jaweed's supposed "interpretations" of Mohammed's words were deeply prejudicial and amounted to the sort of lay opinion testimony that courts regularly reject.  And it compounded the prejudice caused by his failure to investigate; the two failures taken together allowed a biased witness not only to testify about Mohammed's *actions*, but also to interpret Mohammed's very *words* for a jury that knew nothing of the witness's grave credibility issues.

16

Federal Rule of Evidence 701 restricts lay witness opinions or inferences to those which are "(a) rationally based on the witness' perception; (b) helpful to clearly understand[ ] the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Courts interpreting Rule 701 have said it applies when a witness purports to interpret what a defendant meant when he said something; as they have explained, such testimony constitutes lay opinion about what the defendant *knew* when he made the statement. See United States v. Kaplan, 490 F.3d 110, 117-18 (2d Cir. 2007) (question what witness "underst[ood Kaplan] to mean" is equivalent to a question about "Kaplan's knowledge"); United States v. Garcia, 291 F.3d 127, 141 (2d Cir. 2002) (in testifying "about what he understood [the defendant] to mean, [the witness] was indirectly offering his opinion about what [the defendant] knew."); cf. DeLoach v. United States, 307 F.2d 653, 655 (D.C. Cir. 1962). And they have rejected such lay opinion testimony when it tells the jury how to fill in gaps in a defendant's statements. In United States v. Grinage, 390 F.3d 746 (2d Cir. 2004), for example, the court held that a federal agent's testimony regarding the defendant's ambiguous statements were references to drugs was inadmissible because the testimony "usurped the function of the jury to decide what to infer from the content of the calls." Id. at 750. As the Court explained, such testimony "not only tell[s the jury] what was in the evidence but . . . what inferences to draw from it." Id. See also 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 701.05 (2d ed. 2004) ("Weinstein") (courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations").

The prosecution in this case elicited just such inadmissible testimony from Jaweed at least *118* separate times. The D.C. Circuit's opinion gave one example: "Jaweed testified that

17

when Mohammed discussed blowing up mines around 'Dagosar' and 'the Red Castle' he was referring to government cars, and that plans to 'fire missiles toward the airport,' referenced the Jalalabad airfield." D.C. Cir. Op. 21-22 (citations omitted). But that was only the tip of the iceberg. Jaweed also repeatedly asserted that when Mohammed used the word "they" he meant the Taliban, even though Mohammed never once mentioned the Taliban in the audio recordings. Ex. 1, p. 48, 52 (5/9/08 p.m. Tr.); Ex. 3, p. 6, 8, 21, 33 (5/12/08 a.m. Tr.). Jaweed also provided varying claims about the words Mohammed used to mean "missiles"; at times he said the term "equipment" meant "missiles," while at another point he said "material" meant "missiles." Ex. 3, p. 7, 35 (5/12/08 a.m. Tr.). And Jaweed's testimony at other times seemed internally contradictory; at one point he said Mohammed used the word "program" to mean "the attack or war," while elsewhere he suggested that the word "program" meant something else. Ex. 1, p. 53 (5/9/08 p.m. Tr.); Ex. 3, p. 7, 22, 39 (5/12/08 a.m. Tr.).

These "interpretations" put highly prejudicial words in Mohammed's mouth. They likely were inadmissible given that they "usurped the function of the jury to decide what to infer from the content of the calls." Grinage, 390 F.3d at 750. And yet trial counsel objected only once – after Jaweed had already offered 51 such interpretations of Mohammed's words. Ex. 1, p. 45-53 (5/9/08 p.m. Tr.); Ex. 3, p. 6-10, 19, 23-25 (5/12/08 a.m. Tr.). This Court sustained the objection. Ex. 3, p. 27 (5/12/08 a.m. Tr.). Jaweed then offered similar interpretations 67 more times, with no objection from Mohammed's trial counsel. Id. at 28-29, 33, 35-40, 49-54, 57-58, 62-68; Ex. 4, p. 17, 40, 42-44, 47 (5/12/08 p.m. Tr.). Nor did trial counsel take any other step to mitigate or counteract Jaweed's interpretations. He did not identify them for the jury at closing argument as a reason to doubt the government's interpretation of the tapes. He did not call a

18

witness to offer a different take. Instead, he did the same thing he had done with respect to witness investigation: nothing at all.

Trial counsel's failure to take issue with these "interpretations" of Mohammed's words was prejudicial in its own right because it allowed Jaweed to tell the jury that Mohammed was referring to the Taliban, missiles, and attacking government cars even when Mohammed's actual words said nothing of the sort. But it also compounded the prejudice Mohammed suffered due to trial counsel's failure to investigate potential witnesses. By failing to uncover those witnesses *and* failing to object to Jaweed's statement, trial counsel allowed a deeply biased witness to put words in his sworn enemy's mouth. That is prejudicial under any definition of the term.

## III. COUNSEL'S FAILURE TO RAISE AN ARGUMENT OF DURESS WAS UNREASONABLE AND PREJUDICIAL.

Trial counsel's performance was ineffective for a third reason too: His failure to advance a duress claim was unreasonable, and that failure prejudiced Mohammed because if counsel had raised duress Mohammed's sentence likely would have been different.

Defendants are constitutionally entitled to effective assistance of counsel during sentencing. United States v. Ellerbe, 372 F.3d 462, 467 (D.C. Cir. 2004). To establish an ineffective assistance of counsel claim in the sentencing context, a defendant must show "(1) that 'counsel's representation fell below an objective standard of reasonableness;' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." United States v. Harris, 894 F. Supp. 20, 26 (D.D.C. 1995) (quoting Strickland, 466 U.S. at 687–94). Any increase in prison time attributable to deficient performance may constitute prejudice. See Glover v. United States, 531 U.S. 198, 203 (2001).

Here trial counsel's performance was unreasonable, and Mohammed was prejudiced, because the facts that emerged at trial should have made it obvious to trial counsel that Mohammed had a viable claim of duress. Jaweed testified at trial that while living in Pakistan in 2006, he was summoned by a former Taliban official from his native village, which is also Mohammed's village. Ex. 1, p. 12-13, 17, 19-25 (5/9/08 p.m. Tr.). At this meeting, the official allegedly asked Jaweed to return to Afghanistan to carry out a missile attack on Jalalabad airport and to solicit Mohammed's help in doing so. Id. at 24. During trial testimony, the government asked Jaweed why he did not reject the Taliban's request. He responded: "had I told him, my life and my family's life was in danger." Id. at 25. He went on to explain that not doing what the Taliban said was "dangerous for me and my family." Id. at 26. Out of fear and under duress, Jaweed took the first steps to obey the Taliban's order by uprooting his family, leaving his job and moving back to Afghanistan. Id. at 25-27. In essence, Jaweed had no choice because it was too dangerous to say "no" to the Taliban.

There is no doubt that Jaweed's fear of the Taliban was well-grounded. At the time of trial, the Taliban exerted significant power in Peshawar, Pakistan, as well as inside Jaweed and Mohammed's native province of Nangarhar, Afghanistan. Antonio Giustozzi, Koran Kalashnikov and Laptop: The Neo-Taliban Insurgency in Afghanistan, 60-66, 83, 90 (2008). As a result, even the chief of police for Chaparhar district in Nangarhar, Haji Latif, in testimony for the government, said he impressed upon the DEA that he did not want his identity revealed because "the Taliban are enemy and they're very dangerous people and I had concern about my safety." Ex. 6, p. 17 (5/13/08 p.m. Tr.). The government witnesses' own trial testimony thus established that crossing the Taliban was a deadly risk. And if that was so for Jaweed, it was equally so for Mohammed, whom Jaweed approached at the Taliban's request. See supra at 2,

20

19. If Mohammed failed to cooperate, he could suffer the same consequences that Jaweed feared when he met the Taliban.

This duress was a mitigating factor that counsel should have argued to advocate a downward departure in Mohammed's sentencing.    Section 5K2.12 of the 2008 Federal Sentencing Guidelines states that if the defendant commits an offense because of "serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may depart downward." Under that provision, coercion is "sufficiently serious to warrant departure . . . when it involves a threat of physical injury." Id. Mohammed's case meets that criterion. For Mohammed not to cooperate with the Taliban meant facing the real threat of death or serious injury, given the Taliban's reputation and reach within Afghanistan. Furthermore, no other reasonable alternative existed given the fact that even the local police chief asked the DEA to hide his involvement in the case because he feared for his life. As this Court has explained in other cases, a threat to the defendant's life, "though not a complete criminal defense, constitutes coercion and duress, a mitigating factor that supports downward departure." United States v. Ortega-Mendoza, 981 F. Supp. 694, 695 (D.D.C. 1997). And yet trial counsel failed to articulate a duress argument to this Court at sentencing. That failure was unreasonable, given the wealth of duress evidence that emerged at trial, and prejudicial because it may well have saddled Mohammed with a longer sentence that he otherwise would have faced.

## IV.    THE CUMULATIVE EFFECT OF COUNSEL'S VARIOUS ERRORS RENDERED HIS ASSISTANCE CONSTITUTIONALLY DEFICIENT.

Each of trial counsel's failures, as set forth above, constituted ineffective assistance sufficient to require a new trial or, in the case of the duress issue, resentencing. But even if this Court thought each individual failure were a close call under Strickland, they certainly amount to ineffective assistance when viewed as a whole.

21

"In judging counsel's performance under Strickland, the question is not whether 'a particular act or omission' was unreasonable, but whether 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' In other words, a court must consider the cumulative effect of counsel's errors." Marquez, 653 F. Supp. 2d at 4 (quoting Strickland, 466 U.S. at 689-90); accord Lindstadt, 239 F.3d 191 at 199-202 (considering counsel's errors in the aggregate and holding that the cumulative effect of four errors amounted to ineffective assistance). The cumulative effect of the errors described above was to deprive Mohammed of the counsel the Constitution requires. A reasonable pretrial investigation would have uncovered significant impeachment evidence, yet despite ample opportunity counsel conducted no such investigation. Counsel compounded that error by allowing an apparently biased witness to put incriminating words in Mohammed's mouth. And counsel failed to argue that Mohammed's involvement in the narcotics transaction was the product of duress, even though the government witness's own testimony made it apparent that such an argument was available to Mohammed. The cumulative weight of these errors pushed counsel's effectiveness below the constitutional baseline.

## CONCLUSION

For the foregoing reasons, Mohammed respectfully requests that this Court vacate his conviction, or in the alternative order resentencing, due to ineffective assistance of counsel.

Respectfully submitted,

Date:  March 1, 2013                              By:_____

Peter S. Spivack
Sarah E. Dean
Adnan A. Zulfiqar
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Tel: 202.637.5600
Fax: 202.637.5910

Attorneys for Defendant
Khan Mohammed

23

## CERTIFICATE OF SERVICE

I certify that on March 1, 2013, I caused the foregoing motion to be served upon the Filing Users identified below through the Court's Case Management/Electronic Case Files system:

BRIAN G. SARDELLI
U.S. Department of Justice
Criminal Division
Narcotic & Dangerous Drug Section/Litigation Unit
1400 New York Avenue, NW, 8th Floor
Washington, DC 20005
Email: brian.sardelli2@usdoj.gov

JAIME PERRY
U.S. Department of Justice, Criminal Division
Narcotic and Dangerous Drug Section
145 N Street, Northeast
East Wing, Second Floor
Washington, D.C. 20530
(202) 307-3262 (Office)
(202) 514-6112 (Fax)

MATTHEW ROBERT STIGLITZ
U.S. Department of Justice
Criminal Division
Human Rights and Special Prosecutions Section
1301 New York Avenue, NW, 2nd Floor
Washington, DC 20530
(202) 305-3646
Fax: (202) 514-0483
Email: matthew.stiglitz@usdoj.gov

_____
Sarah E. Dean