**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No.  06-357 (CKK) |
| | ) | |
| KHAN MOHAMMED, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Khan Mohammed, through undersigned court-appointed counsel, respectfully submits this memorandum in aid of sentencing.

## INTRODUCTION

The central issue at resentencing is the application of the Terrorism Enhancement to Mr. Mohammed's total offense calculation, which dramatically increases the applicable sentencing range. Mr. Mohammed respectfully submits that the Court should not apply the Terrorism Enhancement. First, the post-conviction history of this case found that Mr. Mohammed was not afforded effective assistance of counsel in challenging Jaweed's testimony, which was central to the government's case. Second, the only link between Mr. Mohammed and a crime of terrorism was that established by Jaweed's testimony. Third, counsel for Mr. Mohammed established that an adequate investigation in 2008 would have provided numerous grounds on which to impeach Jaweed's testimony, including extensive evidence of bias and motive to lie. Because of the considerable infirmities in Mr. Mohammed's representation at trial, the only fair—and procedurally constitutional—result is to sentence Mr. Mohammed without relying on Jaweed's testimony.

1

Mr. Mohammed respectfully asks this Court to sentence him to within the 97- to 121-month range for his drug-trafficking conviction—*i.e.*, the advisory guideline range without the Terrorism Enhancement. The holdings of both this Court and the D.C. Circuit support such a sentence, which is consistent with the statutory sentencing factors, the facts and circumstances of this case, and the interests of justice.

## PROCEDURAL HISTORY

As the Court knows, this case has a long history. On October 29, 2006, Mr. Mohammed was arrested by Afghani authorities in Nangarhar Province, Afghanistan in a DEA sting operation, and was subsequently indicted by a United States grand jury for heroin distribution. After Mr. Mohammed rejected a plea to the one count indictment, the United States government secured a superseding indictment adding a second count of distribution of heroin and opium knowing or intending to provide anything of pecuniary value to a person or organization engaged in terrorist activities.

From October 29, 2006 until early November 2007, Mr. Mohammed was detained in Bagram Airbase in Afghanistan, and thereafter was transferred to a United States prison.

On May 15, 2008, Mr. Mohammed was convicted by a jury for distributing one kilogram or more of heroin in violation of 21 U.S.C. §§ 959, 960, and 18 U.S.C. § 2 (the "drug- trafficking" conviction) and distribution of heroin and opium knowing or intending to provide anything of pecuniary value to a person or organization engaged in terrorist activity in violation of 21 U.S.C. §§ 960(a), 841(a), 841(b)(1)(A)(I), and 18 U.S.C. § 2 (the "narcoterrorism" conviction). Mr. Mohammed appeared for sentencing on December 22, 2008, and received concurrent life sentences for the drug-trafficking conviction and the narcoterrorism conviction.

Mr. Mohammed filed an appeal on January 5, 2009 in the U.S. Court of Appeals for the D.C. Circuit. On appeal, Mr. Mohammed argued, among other things, that he was prejudiced by trial counsel's ineffective assistance. The Court of Appeals remanded the case for further proceedings on Mr. Mohammed's ineffective-assistance claim. *United States v. Mohammed*, 693 F.3d 192, 202–205 (D.C. Cir. 2012) ("*Mohammed I*"). Five years later, following further proceedings in this Court, the D.C. Circuit held that Mr. Mohammed received ineffective assistance of counsel and again remanded for further proceedings to determine whether the ineffective representation prejudiced Mr. Mohammed as to his narcoterrorism conviction. *United States v. Mohammed*, 863 F.3d 885, 893–894 (D.C. Cir. 2017) ("*Mohammed II*").

On remand, this Court permitted court-appointed counsel for Mr. Mohammed to recreate what an adequate pre-trial investigation in 2008 would have shown. As a result of that investigation, counsel provided affidavits from sixteen witnesses in Afghanistan summarizing testimony the witnesses would have presented on Mr. Mohammed's behalf at trial. Based on this new evidence, on December 9, 2021, this Court granted Mr. Mohammed's renewed Motion to Vacate his narcoterrorism conviction. Memorandum Opinion ("Op."), 25–26, (Dec. 9, 2021), Dkt. 209. This Court held that the credibility of the government's key witness—whose testimony "constituted the bulk of the government's case against" Mr. Mohammed and who provided the sole link between Mr. Mohammed and the Taliban—could have been effectively undermined such as to result in Mr. Mohammed's acquittal at trial of the narcoterrorism charge. *Id.* at 18, 24.

Mr. Mohammed's resentencing is scheduled for July 18, 2022.  The U.S. Probation Office recommends a sentence of 348 months' imprisonment and 60 months of supervised release with the special condition that he comply with deportation proceedings. Sentencing Recommendation at 1 (Apr. 8, 2022), Dkt. 216. The government seeks a life sentence. Dkt. 224.

The 2022 Pre-Sentence Investigation Report ("2022 PSR") inappropriately relies on the testimony of the government's key trial witness, Jaweed, both in setting forth the offense conduct and in applying a 12-level Terrorism Enhancement. The Terrorism Enhancement dramatically increases the guideline sentencing range from 97 to 121 months to 360 months to life. 2022 PSR at 22 (Apr. 8, 2022), Dkt. 215; *see also* Dkt. 216.

For the reasons described below, Mr. Mohammed respectfully submits that the Court should not apply the Terrorism Enhancement. Mr. Mohammed asks this Court to sentence him to within the 97- to 121-month range for his drug-trafficking conviction. Such a sentence is consistent with the statutory sentencing factors, the facts and circumstances of this case, and the interests of justice.

## ARGUMENT

I.     **THE COURT SHOULD NOT RELY ON THE 2022 PSR'S RECITATION OF OFFENSE CONDUCT OR ITS SENTENCING RECOMMENDATION BECAUSE IT FAILS TO ACCOUNT FOR THE EXTENSIVE POST-CONVICTION HISTORY OF THIS CASE.**

The 2022 PSR fails to take into account this Court's December 9, 2021 Memorandum Opinion and the D.C. Circuit's Opinions in *Mohammed I* and *Mohammed II*. Instead, the 2022 PSR inappropriately relies on the testimony of the government's key trial witness, Jaweed, both in setting forth the offense conduct and in calculating the applicable guideline range. Indeed, the portions of the 2022 PSR setting forth the offense conduct—particularly portions related to Mr. Mohammed's alleged terrorism ties—remain substantively unchanged from the original PSR submitted to this Court in advance of Mr. Mohammed's sentencing in 2008. Ex. A (redline showing changes between December 2008 PSR and 2022 PSR). Mr. Mohammed submits that this is error. Given the subsequent appellate and trial court proceedings in this matter, which culminated in this Court's vacatur of Mr. Mohammed's narcoterrorism conviction based on the

4

potential unreliability of key evidence the government presented against him at trial,[1] the 2022 PSR suffers from significant errors. This Court should not rely upon its characterization of the offense conduct or follow its sentencing recommendation.[2]

The importance of Jaweed's testimony to the government's case against Mr. Mohammed cannot be overstated. Both this Court and the D.C. Circuit have underscored the centrality of Jaweed's testimony: "As noted by the D.C. Circuit, at trial, Government counsel repeatedly asked Jaweed 'to explain Mohammed's meaning, rather than [asking for] Jaweed's understanding of what Mohammed was telling him.'" Op. at 18 (quoting *Mohammed II*, 863 F.3d at 892). This Court has explicitly rejected the Government's "argument that it could have made its case based solely on Defendant's words" as "speculative and unsupported by the record cited by the Government." *Id.* at 22. And it has recognized that "the Government's reliance on Jaweed's testimony was an essential part of its case, which cannot now be discounted as that changes the entirety of the case that was presented to the jury." *Id.* at 22. These findings should not be discounted, and the offense conduct and offense level computation should not be framed as though Mr. Mohammed's narcoterrorism conviction—and the faulty testimony that supported it—remain intact. To do so would violate both Mr. Mohammed's constitutional due process rights and stretch the concept of relevant conduct beyond its breaking point.

This Court's and the D.C. Circuit's factual and legal findings instead have unmistakable implications for the 2022 PSR and this Court's re-sentencing determinations. Given the Court's

---

[1] This outcome is exceedingly rare. *See, e.g.*, Nancy J. King et al., Executive Summary: Habeas Litigation in U.S. District Courts 5, 9–10 (2007), https://perma.cc/G9SF-FM8M (noting that a majority of federal habeas petitions filed in district courts raise ineffective assistance of counsel claims but that grant rates are extremely low: only 1 in every 341 in non-capital cases).

[2] Given the option of retrying Mr. Mohammed on the vacated terrorism count, the government elected not to do so. Jan. 19, 2022 email from Jamie Perry, Trial Attorney, U.S. Department of Justice, Criminal Division, to counsel for Mr. Mohammed.

factual findings as set forth in its December 9, 2021 Memorandum Opinion and the appellate history of this case, this Court should not rely—and the 2022 PSR should not have relied—upon Jaweed's testimony either in setting forth the offense conduct or in calculating the applicable offense level. *See United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018) (declining to consider, "for purposes of determining the relevant facts by a preponderance of the evidence" at sentencing, highly inculpatory testimony from a witness who demonstrated a bias against the defendant); *see also United States v. Newton*, 327 F.3d 17, 29 (1st Cir. 2003) (upholding trial court's decision to disregard testimony of an unreliable witnesses in sentencing); *United States v. Simmons*, 964 F.2d 763, 776 (8th Cir. 1992) (finding error in trial court's reliance at sentencing on testimony that lacked sufficient indicia of reliability where witness lied about being subject to a drug test and gave inconsistent statements).

Accordingly, the Court should disregard the 2022 PSR's recommended sentence and base its sentencing decision on the offenses and allegations that have survived appellate and post-conviction scrutiny. Specifically, the Court should disregard or discount Jaweed's testimony and sentence Mr. Mohammed on the basis of the offense conduct that remains. In short, the Court should sentence Mr. Mohammed as a drug trafficker who has already been in jail since November 5, 2007, not a terrorist.

## II. THE COURT SHOULD DISREGARD JAWEED'S TESTIMONY IN DETERMINING THE OFFENSE CONDUCT

The practical effect of the Court's vacatur of Mr. Mohammed's narco-terrorism conviction is to return to the status quo ante that would have existed had the jury acquitted Mr. Mohammed of narcoterrorism in 2008. The offense conduct the Court considers in making its sentencing determination should be based upon the evidence at trial and the jury's verdict, as modified by this Court's vacatur of the narcoterrorism conviction. The 2022 PSR is of limited utility in this

endeavor because it makes no material changes to the offense conduct as recited in the 2008 PSR, and relies upon the same allegations the Court has found cannot support the narcoterrorism conviction because they rest upon the testimony of a witness reasonable jurors may have found to be unreliable.[3] *See* Ex. A (redline showing minimal changes to description of the offense conduct as set forth in the December 2008 PSR and the 2022 PSR); *see also* Op. at 18, 25–26. Simply put, following the lengthy post-conviction proceedings and the Court's December 9, 2021 Opinion, this is a very different case than the one the Court confronted in Mr. Mohammed's original sentencing on December 22, 2008. *Compare, e.g.*, Ex. B Sentencing Tr. 44:10–13 ("Evidence proved that the Defendant was a member of the Taliban in contact with two Taliban leaders . . . ."), *id.* 50:8–11 ("I would say, again, that this is not just drug trafficking, it has the terrorist aspect of it, which makes it unique among criminals, even though he does not have a prior criminal record."), *and id.* 51:11–14 ("I think it's clear that you're a member of the Taliban. I think it's clear that you're a terrorist.") *with* Op. at 21 ("The Court finds that Mr. Mohammed's connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government. Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words."), *id.* at 24 (observing that "Jaweed's testimony…constituted the bulk of the Government's case against Defendant"), *and id.* at 25–26 (vacating conviction because Jaweed's testimony could have been "(at least partially) discredit[ed]," leading a reasonable jury to acquit Mr. Mohammed of narcoterrorism). In the wake of the Court's Memorandum Opinion, reliance upon Jaweed's testimony for any reason is both legally untenable and unconstitutional. *Cf. United States v. Williams*, 823 F. App'x 128, 132 (4th Cir. 2020) ("Due process requires that sentencing courts rely only on evidence with some minimal

---

[3]     Mr. Mohammed also made these arguments to the Probation Office, as noted in the 2022 PSR. Dkt. 215, 18–20.

level of reliability ... and the Guidelines themselves demand that the evidence used have 'sufficient indicia of reliability to support its probable accuracy.' ") (internal citations omitted).

As explained in Mr. Mohammed's objections to the draft 2022 PSR, Dkt. 215 at 18, the offense conduct described in the 2022 PSR impermissibly relies extensively upon Jaweed's faulty testimony. For instance, the narrative of Jaweed's purported recruitment by Abdul Rahman, the alleged Taliban leader in Nangarhar Province, to procure rockets and advance the Taliban's terroristic objectives and of Jaweed's first meeting with Mr. Mohammed to discuss the plot to obtain rockets is the product of Jaweed's trial testimony. *See* 2022 PSR ¶¶ 13–15; *see also id.* at 18 (Addendum to the Presentence Report setting forth Mr. Mohammed's objections to draft PSR). This Court found a reasonable jury could have discredited that testimony in light of the substantial bias evidence that effective counsel could have elicited at trial. Op. at 18. Without Jaweed's flawed trial testimony, Mr. Mohammed's recorded statements do not connect him to the Taliban or to terrorism. *E.g.*, Op. at 20 ("[T]hese words fail to link Defendant to the Taliban but rather, they portray Mr. Mohammed as being violent."); *see also Mohammed I*, 693 F.3d at 204 (same). The PSR also references the alleged plot to procure rockets for the purpose of advancing the Taliban's terroristic objectives, 2022 PSR ¶ 16, Dkt. 215 at 6, which is objectionable and unreliable for the same reasons.

Similarly, any reference to Mr. Mohammed's purported "prior acts of terrorism," 2022 PSR ¶ 17, Dkt. 215 at 6, directly conflicts with the findings of fact and conclusions of law set forth in the D.C. Circuit's remand order and this Court's Memorandum Opinion vacating Mr. Mohammed's narcoterrorism conviction. *See, e.g.*, Op. at 19–20 (explaining that violent actions do not necessarily equate with terrorism). And the 2022 PSR's lengthy excerpts of trial testimony are irrelevant without the context of Jaweed's flawed testimony.

The 2022 PSR also confuses Mr. Mohammed's statements with Jaweed's interpretations of Mr. Mohammed's statements. Although the 2022 PSR purports to attribute direct statements to Mr. Mohammed, in fact, his recorded statements were—as both the D.C. Circuit and this Court have explained—played for the jury, over the course of two days, as Jaweed narrated, explained, and interpreted the audio tapes with the assistance of a translator. *Mohammed I*, 693 F.3d at 197; *Mohammed II*, 863 F.3d at 888. As this Court has acknowledged, at trial the government "repeatedly asked Jaweed 'to explain Mohammed's meaning, rather than [asking for] Jaweed's understanding of what Mohammed was telling him.'" Op. at 18 (quoting *Mohammed II*, 863 F.3d at 892). There are thus "numerous examples" of incriminating statements the government was able to attribute to Mr. Mohammed through Jaweed's testimony. *Id.* at 20–21.

For example, the 2022 PSR states that Mr. Mohammed "promised to obtain for Jaweed a position with the Taliban when it re-takes control of Afghanistan." 2022 PSR ¶ 18. But this Court has expressly held that "Mr. Mohammed's connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government." Op. at 21. "Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words." *Id.*; *see also Mohammed I*, 693 F.3d at 204 ("[Jaweed] explained the recordings and provided context for them."); *id.* ("Jaweed's testimony arguably shaped how the jury understood Mohammed's words."); *Mohammed II*, 863 F.3d at 888 (explaining that "the government repeatedly asked Jaweed to clarify the meaning of exchanges between him and Mohammed" and reiterating that "Jaweed's testimony arguably shaped how the jury understood Mohammed's words."). The 2022 PSR also states that Mr. Mohammed "discussed previously having fired rockets at the office of the local police chief, and stated his intent to attack not only westerners, but elements of the Afghan government, and those who collaborated with

9

them." 2022 PSR ¶ 18. But as both the D.C. Circuit and this Court have since concluded, without

Jaweed's testimony, there is no offense conduct involving terrorism:

> Jaweed testified that when Mohammed discussed blowing up mines around 'Dagosar' and 'the Red Castle' he was referring to government cars … and that plans to 'fire missiles toward the airport,' referenced the Jalalabad airfield…. Jaweed's testimony arguably shaped how the jury understood Mohammed's words. Without the additional information Jaweed provided that Mohammed was discussing *government* targets, a juror conceivably could conclude that Mohammed was violent, but not a terrorist….

*Mohammed I*, 693 F.3d at 204 (emphasis original); *see also* Op. at 20 ("[w]hile Mr. Mohammed

does repeatedly mention Jihad and killing infidels, on their own, these words fail to link Defendant

to the Taliban but rather, they portray Mr. Mohammed as being violent.").

Moreover, as this Court and the D.C. Circuit have further explained, even the statements

directly attributable to Mr. Mohammed do not stand on their own. Rather, they were infected by

the government's chosen manner of presenting its case against Mr. Mohammed—through Jaweed.

"'[H]ad Mohammed's counsel also independently sown doubt as to Jaweed's credibility, the subtle

distinction between Jaweed's actual testimony (about Mohammed's state of mind) and testimony

to which Jaweed should have been confined (about what he understood Mohammed to mean) could

have been significant.'" Op. at 18 (quoting *Mohammed II*, 863 F.2d at 892). The Court should

disregard paragraphs 19, 21, and 25 of the 2022 PSR for all these reasons.

***

In short, as the subject of a DEA sting operation in war-torn 2006 Afghanistan, Mr.

Mohammed was captured on audio and video tape facilitating a drug transaction and making

statements evincing knowledge that the drugs were purportedly destined for the United States.

During the original December 22, 2008 sentencing, the Court described Mr. Mohammed's role in

the drug transaction this way:

10

> The defendant played a critical role in that he had past experience in drug trafficking and opium. He interviewed four possible sellers and chose one to buy from. He negotiated the price and quantity, inspected the opium, and gave his approval prior to the sale. Jaweed gave the money to the Defendant. The Defendant consummated the drug deal by paying the seller. Moreover, the Defendant was eager to consummate other drug deals involving both opium and heroin and was even interested in being involved in converting the opium to heroin.

Ex. B at 20:6–15 (Dec. 22, 2008); *id.* 46:24–47:3 (referencing this evidence in reciting the offense conduct).

Unlike Mr. Mohammed's tangible conduct relevant to the drug-trafficking offense, however, the alleged offense conduct relevant to his purported terrorism connections came only in the form of words, not actions. In the end, the record does not establish that Mr. Mohammed *acted* on any violent statements or took any concrete steps toward violent ends beyond simply talking with Jaweed. *See, e.g., id.* 48:5–8 ("Although we only have the Defendant's statements about attacking government cars with mines and having other weapons, there's no reason to tell Jaweed this unless this was correct."); *id.* 51:19–21 ("I mean, if Jaweed had not gone to Colonel Latif, you might very well have been the one to attack the Jalalabad airport and police station."). And those words—even when they emerged from Mr. Mohammed's own mouth—did not stand alone and speak for themselves, but rather were elicited and drawn out of Mr. Mohammed by and through the government's informant, Jaweed. *See, e.g., id.* 47:11–15 ("At the same time Jaweed indicated, as these drug sales were discussed and going on between Jaweed and the Defendant, that he had found more missiles. And the Defendant indicated that he had a source for the warheads for these missiles.") (emphasis added); *id.* 48:8–12 ("I would also note that Rahman, the Taliban leader, told Jaweed that the Defendant was the person to help him plan the attacks. So, the Taliban sent him directly to the Defendant. This isn't Jaweed enticing the Defendant into getting involved with

11

this.") (emphasis added). None of this testimony, including Mr. Mohammed's own statements, would exist without Jaweed.

In light of the extensive post-conviction proceedings in this matter and the Court's December 21, 2021 Memorandum Opinion, the Court should disregard Jaweed's testimony. Doing so leaves the drug conduct—negotiating and transacting a drug sale—along with disembodied statements that express dislike of Americans and the presence of a foreign power in Afghanistan. Regardless of one's personal feelings about them, such statements are insufficient to support the application of the Terrorism Enhancement, as described in more detail below. And Mr. Mohammed submits that they are an insufficient basis upon which to base a sentence far beyond the applicable guideline range for the drug-trafficking offense of conviction.

## III.    THE TERRORISM ENHANCEMENT DOES NOT APPLY

Application of the terrorism enhancement drives the sentencing range in this case. "The Terrorism Enhancement … increases by twelve the base offense level for calculating a sentencing range if the defendant was convicted of a crime that 'involved, or was intended to promote, a federal crime of terrorism.'" *Mohammed I*, 693 F.3d at 339; U.S.S.G. § 3A1.4(a). Over Mr. Mohammed's objection, the 2022 PSR applied the enhancement, increasing Mr. Mohammed's base offense level from 30 to 42. 2022 PSR ¶¶ 32–41.[4] Wholly absent from the 2022 PSR's offense level computation, however, is any acknowledgement that Mr. Mohammed's narcoterrorism conviction under 21 U.S.C. §§ 960a, 841(a) and (b)(1)(A)(i) has been vacated. Rather, the 2022 PSR suggests that the Court's vacatur of Mr. Mohammed's narcoterrorism conviction has no practical effect on the applicable offense level. For the reasons described above and further below, this is incorrect.

---

[4]    Mr. Mohammed also made these arguments to the Probation Office, as noted in the 2022 PSR. Dkt. 215, 20–22.

**A. The Court should apply a heightened standard of proof given the disproportionate effect the Terrorism Enhancement would have on the applicable guideline range relative to Mr. Mohammed's offense of conviction.**

The government bears the burden of demonstrating the Terrorism Enhancement should apply. *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997). Although the D.C. Circuit has not yet considered the issue, Mr. Mohammed contends that the clear and convincing burden of proof should apply here, where the application of the Terrorism Enhancement would result in a dramatic and unconstitutional increase in the guideline range—from 97 to 121 months to 360 months to life. *See* U.S.S.G. § 3A1.4. In other words, the 12-level increase in base offense level and automatic upgrade to a criminal history Category VI would result in a minimum increase of 21.9 years to the guideline range—i.e., it would *at least* nearly *triple* the upper limit of the guideline range for the offense of conviction. *See id.*; *see also* 2022 PSR ¶¶ 32–41.

The Supreme Court has acknowledged that a heightened standard of proof may be appropriate where a sentencing court's factual determinations would significantly increase the sentence. *United States v. Watts*, 519 U.S. 148, 156–57 (1997). In such circumstances, the Ninth Circuit applies a clear and convincing standard of proof to enhancements that have an "extremely disproportionate" effect on the guideline range relative to the offense of conviction. *See United States v. Hymas*, 780 F.3d 1285, 1289–91 (9th Cir. 2015) (enhancement resulting in an eight-level increase, which "more than doubled the Guidelines imprisonment range," required clear and convincing evidence); *United States v. Staten*, 466 F.3d 708, 718 (9th Cir. 2006) (fifteen-level enhancement that more than doubled defendant's sentence required clear and convincing proof); *United States v. Jordan*, 256 F.3d 922, 929 (9th Cir. 2001) (holding that a contested nine-level enhancement, which increased the sentence range from 70–87 to 151–188 months required clear and convincing evidence). Although the D.C. Circuit has to date declined to *require* more than a

preponderance at sentencing, the Court of Appeals has not adopted a categorical approach in all cases, opting instead to carefully weigh whether a given case warrants a heightened standard of proof. *United States v. Long*, 328 F.3d 655, 670–71 (D.C. Cir. 2003) (observing that the Court has "declined to require more than the preponderance standard at sentencing[,]" but going on to conclude that the eight-level increase in Defendant's base offense level did not constitute extraordinary circumstances warranting a heightened standard of proof).[5]

At Mr. Mohammed's December 22, 2008 sentencing, the Court cited *Long* for the proposition that "[t]he standard of proof for application of enhancements, even in extraordinary circumstances, with a substantial increase in the offense level is preponderance of the evidence." Ex. B at 17:22–18:2. On that basis the Court declined to apply a heightened standard of proof. *Id.* Although Mr. Mohammed acknowledges that the D.C. Circuit does not *require* the application of a heightened standard of proof, Mr. Mohammed urges the Court to exercise its discretion and apply it here given the significant post-conviction record and the findings articulated in the Court's December 22, 2021 Memorandum Opinion. *Cf. Watts*, 519 U.S. at 156–57; *Hymas*, 780 F.3d at 1289–91; *Staten*, 466 F.3d at 718; *Jordan*, 256 F.3d at 929.

---

[5]    *Long*'s reasoning on this point was directed to the pre-*Booker* concern articulated in, for example, *McMillan v. Pennsylvania* of a sentencing enhancement that becomes the "tail which wags the dog of the substantive offense." 477 U.S. 79, 88 (1986). The Supreme Court overruled *McMillan*, *Alleyne v. United States*, 570 U.S. 99, 112 (2013), and this concern is abated now that the Supreme Court has clarified that the guidelines are advisory. But as the Ninth Circuit has explained, nothing in the *Booker* line of cases is inconsistent with applying a heightened standard of proof in cases in which an enhancement dramatically increases the guideline range. *See Staten*, 466 F.3d at 718–19 (examining authorities and concluding "neither the holdings nor the reasoning of our prior case law concerning heightened burdens of proof at sentencing are irreconcilable with *Booker*.").

**B. Mr. Mohammed's offense of conviction does not constitute a "federal crime of terrorism" and, even if the Court applies the "intended to promote" prong, it is improper to conclude on this record that Mr. Mohammed had the requisite intent under Section 2332b(g).**

The Terrorism Enhancement applies if the defendant was convicted of a crime that "involved, or was intended to promote, a federal crime of terrorism." It can arguably be applied in two circumstances. Neither circumstance applies here given the post-conviction proceedings described above and this Court's December 9, 2021 Opinion. The first scenario requires that the offense itself constitute a federal crime of terrorism. U.S.S.G. § 3A1.4(a); *United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) ("an offense 'involves' a federal crime of terrorism *only* if the crime of conviction is itself a federal crime of terrorism") (internal quotation marks omitted; emphasis added). This basis—which was the one upon which the Court relied in sentencing Mr. Mohammed nearly thirteen and a half years ago, Ex. B at 7:15–22—is now inapplicable because the Court has vacated Mr. Mohammed's narcoterrorism conviction, leaving only the drug-trafficking conviction. Accordingly, the Terrorism Enhancement cannot be applied on the basis that the offense "involved" a federal crime of terrorism.

The second basis upon which other Circuits have found that the Terrorism Enhancement can be applied is when the offense is "intended to promote" a federal crime of terrorism.[6] U.S.S.G. § 3A1.4(a); *Fidse*, 863 F.3d at 522. These Circuit Courts of Appeal have found that the enhancement can be applied where the defendant's "purpose is to promote a terrorist crime." *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004); 18 U.S.C. § 2332b(g)(5) (defining "federal crime of terrorism" as an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"). As the

---

[6]    The D.C. Circuit has not yet considered the issue. The question was not presented in Mr. Mohammed's 2012 appeal because the narcoterrorism offense satisfied the definition of "Federal crime of terrorism." *Mohammed I*, 693 F.3d at 339; 18 U.S.C. § 2332b(g)(5)(B).

Seventh Circuit has stated, "[i]n enhancing a defendant's sentence pursuant to § 3A1.4 where the defendant has not been convicted of a federal crime of terrorism, however, a district court must identify which enumerated federal crime of terrorism the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record." *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005); *see also United States v. Arcila Ramirez*, 16 F.4th 844, 855 (11th Cir. 2021) (holding that the district court erred in applying the Terrorism Enhancement because it failed to make factual findings on the intent of the defendant and instead relied on the defendant's guilty plea).

Following this Court's Memorandum Opinion, it is impossible to find that Mr. Mohammed's purpose was to promote terrorism—no matter which burden of proof is used. The factual findings about Mr. Mohammed's intent are heavily—if not completely—reliant on Jaweed's flawed trial testimony and his improper interpretation of the intended meaning of Mr. Mohammed's recorded statements played at trial. *See* Op. at 20–21 ("Nor can this Court now disregard that the Government relied heavily upon Jaweed's testimony in order to obtain a conviction against Defendant."); *Mohammed II*, 863 F.3d at 892 ("Jaweed's testimony was the only evidence that linked Mohammed to the Taliban. It thus provided critical support for the narcoterrorism charge."). In the 2008 sentencing, the Court found two alternative bases to conclude that Mr. Mohammed possessed the requisite intent under Section 2332b(g): (1) he "specifically intend[ed] to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan," and (2) he "specifically intend[ed] and [was] motivated by the drugs' destructive powers on U.S. civilian populations as a means of violent jihad against Americans who have fighting forces in Afghanistan against the Taliban." Ex. B at 17:8–15; *see also Mohammed I*, 693 F.3d at 201–202 & n.3 (concluding that the first basis was not clearly

16

erroneous and declining to address the second). Yet both of these findings are intimately bound up with Jaweed's testimony. *See, e.g.*, Ex. C, at 10 (Trial Testimony Excerpts) (Jaweed testifying to the meaning of Mr. Mohammed's recorded statements: "He's trying to say that I have my own car, we will use it to bring them here around noon time."), 14 (Q: "In response, he says 'Good, may God turn all the infidels to dead corpses.' Which infidels is Khan Mohammed referring to?" A: "The Americas and the British."). Jaweed's testimony has been discredited as potentially unreliable and cannot—without other supporting evidence—serve as a basis to apply the Terrorism Enhancement.

Another court in this District addressed the evidence necessary to apply the Terrorism Enhancement without an underlying terrorism crime in *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 198 (D.D.C. 2018). The court held that it could not credit the testimony of an unreliable witness who provided inculpatory statements about the defendant's connection to terrorism. *Id.* But because that testimony "[did] not stand alone as evidence of [the defendant's] intentions" and there was an additional body of evidence that spoke to the defendant's terrorist connections, the court applied the enhancement. *Id.* at 198–99. Abu Khatallah directed the attacks on the U.S. Special Mission in Benghazi, and the Court inferred intent to retaliate against or influence government from his choice of target and other testimony. *Id.* at 183–84, 198–99.

This case is different. No act of violence occurred, and Jaweed's testimony stands *alone* as the sole evidence connecting Mr. Mohammed to the Taliban and terrorism. There is no additional body of evidence speaking to terrorist connections, as both this Court and the D.C. Circuit have unambiguously concluded over the course of approximately 10 years of post-conviction proceedings. *See, e.g.*, Op. at 20 (explaining that Mr. Mohamed's recorded statements "own their own … fail to link [him] to the Taliban"); *id.* at 21 ("The Court finds that Mr. Mohammed's

17

connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government. Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words."); *see also Mohammed II*, 863 F.3d at 888 ("The government repeatedly asked Jaweed to clarify the meaning of exchanges between him and Mohammed."); *Mohammed I*, 693 F.3d at 204 ("[Jaweed] explained the recordings and provided context for them."). And crucially, this Court and the D.C. Circuit have been equally clear that statements about violent acts are not tantamount to terrorism. *Mohammed I*, 693 F.3d at 204 ("Without the additional information Jaweed provided that Mohammed was discussing a government target, a juror could conceivably conclude that Mohammed was violent, but not a terrorist…."); Op. at 19–20 ("While Mr. Mohammed does repeatedly mention Jihad and killing infidels, on their own, these words fail to link Defendant to the Taliban but rather portray Mr. Mohammed as being violent.").

Without Jaweed's inculpatory statements about Mr. Mohammed or Jaweed's extensive substantive commentary about Mr. Mohammed's recorded statements, Op. at 20, there is no support for a factual finding—under any standard of proof—that Mr. Mohammed "intended to promote" a crime of terrorism, whether narcoterrorism, 18 U.S.C. § 960a, providing material support to a terrorist organization, *id.* § 2339B, or otherwise. As a result, the Terrorism Enhancement cannot be applied on the "intended to support" basis either.

Because the Terrorism Enhancement cannot be supported under either potential theory, Mr. Mohammed respectfully submits that the Court should not apply the 12-point enhancement under § 3A1.4(a).

IV.    **THE GUIDELINE RANGE SENTENCE FOR THE DRUG-TRAFFICKING OFFENSE OF CONVICTION, 97–121 MONTHS, IS SUFFICIENT BUT NO GREATER THAN NECESSARY TO ACHIEVE THE STATUTORY SENTENCING PURPOSES**

In selecting a sentence, this Court must consider, among other things, the need for the sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (B) afford adequate deterrence; (C) protect the public from future crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). As the Probation Office notes, without the Terrorism Enhancement the "advisory guideline range [for Mr. Mohammed's drug-trafficking conviction] is 97 to 121 months." Dkt. 215 at 22. The statutory sentencing factors support a sentence within this range, and Mr. Mohammed requests that the Court impose nothing more.

First, "the nature and circumstances of the offense" favor a 97 to 121 month sentence. 18 U.S.C. § 3553(a)(1). At worst, Mr. Mohammed stands convicted on a drug-trafficking charge and has made violent statements. *E.g.*, Op. at 20; *see also Mohammed I*, 693 F.3d at 204. This drug deal was consummated in Afghanistan, where, unfortunately, narcotics trafficking was prevalent. The only reason Mr. Mohammed is before this Court is because a DEA sting operation recorded a conversation between Mr. Mohammed and Jaweed discussing the drugs potentially being imported into the United States. There is no evidence of whether, when, or how this claimed importation would happen, or that any party had anywhere near the capability to do so. To put it bluntly, without the unsupported allegations of terrorism, the drug deal has little, if any, nexus to the United States or its citizens.

Without excusing Mr. Mohammed's recorded statements expressing dislike of Americans and even referencing violent acts toward Americans, it is important to place those statements in

19

the context in which they were made. In May 2006, the same month in which Jaweed allegedly met with Abdul Rahman in Pakistan, anti-American rioting erupted in Kabul after a U.S. military convoy caused a deadly traffic accident. Some Afghanis "contended that the American military showed a careless attitude toward human life that was becoming a growing problem, whether it was the bombing of villages in counterinsurgency activities in southern Afghanistan or car accidents in the capital."[7] An Afghani citizen explained to the N.Y. Times: "This type of attitude has created a great deal of mistrust and hatred." "One demonstrator… was still shouting, 'Death to Karzai!' and 'Death to America!' hours after the initial event."[8]

Second, "the history and characteristics of the defendant" favors Mr. Mohammed. 18 U.S.C. § 3553(a)(1). The evidence suggests that Mr. Mohammed would quietly reintegrate into Afghan society. Mr. Mohammed was a vegetable farmer his entire life. Dkt. 215, ¶ 62; Affidavit of Haji Mohammad Salam, Dkt. 195-23 at 1 ("[Khan Mohammed] was a good man and did farming to earn for his children and family."). He has no prior criminal history and is a 52-year-old, married father of seven children. Dkt. 215, ¶¶ 42–47, 51, 54. Mr. Mohammed was also a leader in his community and greatly respected by others in his village. Affidavit of Taj Mohammad, Dkt. 195-22 at 1 ("our villagers were too much sad [when Mohammed was seized] because he was a good man . . . [h]e was an impartial man who was doing his farming and attending jirgas as a village leader."); Affidavit of Musaffer Khan, Dkt. 195-21 at 1 ("He was a kind man who loved his people. He was serving people in the village and was a competent man. We grew before him."); Affidavit of Mahkam Khan, Dkt. 195-28 at 1 (stating that Mr. Mohammed was the chair of his village's Community Development Council where it was his job to help resolve disputes in the community).

---

[7]    Carlotta Gall, *Anti-U.S. Rioting Erupts in Kabul; at Least 14 Dead*, N.Y. Times (May 30, 2007), *available at* https://www.nytimes.com/2006/05/30/world/asia/30afghan.html.

[8]    *Id.*

He has also taken advantage of educational opportunities while incarcerated and has the capability to live a productive life with his family. He participated in 3,152 hours of English as a Second Language and is deemed English proficient, and he completed 131 hours of other courses, including GED Science, Arabic, Exploring Asia, Algebra, Independent Study – Life Math, Shakespeare, Spanish, and US History. Dkt. 215 ¶ 11. As reflected in his federal Bureau of Prisons records, Mr. Mohammed has no history of violence while incarcerated. Ex. D (inmate disciplinary record); *see also* 2022 PSR, Part B, Dkt. 215.

Third, Mr. Mohammed's time served already "reflect[s] the seriousness of the offense, [] promote[s] respect for the law, and [] provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Mr. Mohammed has "served approximately 175 months, without consideration for any good conduct time earned while in the BOP." Dkt. 216, 1. The time Mr. Mohammed has already served is nearly 1.5 times the top of the guideline range for the drug-trafficking offense (97 to 121 months)—and years beyond the plea Mr. Mohammed turned down before proceeding to trial.

Fourth, there is simply no need for a life sentence—as recommended by the government—to "protect the public from further crimes of the defendant" or "provide adequate deterrence to others who may contemplate similar crimes." Dkt. 216, 2; *see* 18 U.S.C. § 3553(a)(2)(B)–(C). Although this Court relied heavily on the convicted terrorism nexus in sentencing Mr. Mohammed in 2008, *e.g.*, Ex. B at 50:8–13, 54:5–17, Mr. Mohammed submits that the Court should not do so in the wake of its December 2021 Memorandum Opinion, for the reasons described above. Mr. Mohammed will not be remaining in the United States or ever returning once he has served his sentence; his narcotics conviction makes him an excludable alien subject to immediate deportation.

When he is released, Mr. Mohammed will return to his home in Afghanistan, a country where much has changed since his arrest in 2006. The Taliban is currently in power, not the previous Afghanistan government Mr. Mohammed allegedly opposed. The United States and its military no longer have any presence in the country. There is little risk that Mr. Mohammed's life in Afghanistan will impact the United States. The incapacitation concerns that appear to have played a large role in this Court's sentencing determination in 2008—Ex. B at 54:5–12 (noting "great need to incapacitate"), are simply less acute given these changed circumstances and the passage of time.

Fifth, imposing a 97 to 121 month sentence would advance "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). At present, Mr. Mohammed has served approximately 175 months for his drug-trafficking conviction, which is longer than typical for similar crimes in this District. Indeed, the median sentence in this District for drug trafficking was 25 months in 2021, and the mean sentence was 53 months. United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2021, District of Columbia, 11.[9] Further, even the highest median sentence in this District was 156 months—for sexual abuse. *Id.* Mr. Mohammed's drug-trafficking conduct cannot be worse than that, yet the government would have him serve a sentence incalculably longer (life v. 156 months). The interests of justice are not advanced by such an outcome.

Last, there is no "need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The government admits there is "no identifiable victim." Dkt. 215, ¶ 28.

---

[9]   Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2021/dc21.pdf.

## CONCLUSION

For the reasons described above, this Court should not rely on the 2022 PSR, which inappropriately relies on the testimony of the government's key trial witness, Jaweed, both in setting forth the offense conduct and in calculating the applicable guideline range. Most importantly, the Court should not apply the 12-level Terrorism Enhancement to Mr. Mohammed's drug-trafficking conviction.

Without the 12-level Terrorism Enhancement, the proper Guideline range is 97 to 121 months. For all the reasons set forth herein, Mr. Mohammed respectfully requests that the Court sentence him to a period within this range.

Date: June 3, 2022

Respectfully submitted,

/s/ Peter Spivack_____
Peter S. Spivack
Nathaniel H. Nesbitt
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
*Court-appointed counsel for Defendant Khan Mohammed*

# **CERTIFICATE OF SERVICE**

I certify that on June 3, 2022, I caused the foregoing Defendant's Sentencing Memorandum to be served upon those identified below:

Jamie B. Perry
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave. NW, Rm. 1264
Washington, DC 20530

*Counsel for the Government*

/s/ *Peter Spivack*_____

Peter Spivack

24