# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA )
             ) vs.         ) **PRESENTENCE INVESTIGATION REPORT**

           ) ) **Docket No.: 0090 1:06CR00357-001**

    **Khan Mohammed**         )
                      )

**Prepared for:**     Colleen Kollar-Kotelly
                 United States District Judge

**Prepared by:**     Crystal S. Lustig
                 Senior United States Probation Officer
                 (202) 565-1425
                 crystal_lustig@dcp.uscourts.gov

| **Assistant U.S. Attorney** | **Defense Counsel** |
|---|---|
| Jamie Brinkmeyer Perry | Danielle Courtney Jahn |
| 1301 New York Ave, NW | 625 Indiana Ave, NW |
| 12th Floor | Suite 500 |
| Washington, DC 20530 | Washington, DC 20004 |
| 202-307-3262 | (202) 208-7500 |
| jamie.perry@usdoj.gov | dani_jahn@fd.org |
| | |
| Matthew Robert Stiglitz | Peter Sedky Spivack |
| Human Rights and Special | Adnan Zulfiqar |
| Prosecutions Se 1301 New York | Sarah F. Dean |
| Avenue, NW2nd Floor Washington, | 555 13th Street, NW |
| DC 20530 (202) 305-3646 | Washington, DC 20004 |
| matthew.stiglitz@usdoj.gov | (202) 637-5631; (202) 637-6573 |
| | (202) 637-6573 |
| Brian Sardelli | peter.spivack@hoganlovells.com |
| PO Box 277 | |
| Lonsdale, MN 55046 | Nathaniel H. Nesbitt |
| 202-904-6287 | 1601 Wewatta Street |
| brian.sardelli@outlook.com | Suite 900 |
| | Denver, CO 80202 |
| | 303-454-2538 |
| | nathaniel.nesbitt@hoganlovells.com |

**Sentence Date:**     June 7, 2022, at 10:00 AM

**Date Prepared:**     March 11, 2022          **Date Revised:**     April 8, 2022

**MOHAMMED**, Khan                                                                 **Page 2**

| | | |
|---|---|---|
| **Offense:** | Count 1: | Distribution of One Kilogram or More of Heroin Knowing that the Substance Would be Unlawfully Imported into the United States<br>21 USC §§§ 959(a)(1), (a)(2) and 960(b)(1)(A)<br>10 years to life imprisonment/$4,000,000 fine |

**Release Status:**   Held without bond since arrest on November 5, 2007.

**Detainers:**   Immigration & Customs Enforcement, filed 11/03/2009

**Codefendants:**   None.

**Related Cases:**   None.

**MOHAMMED, Khan**                                                                 **Page 3**

**Identifying Data:**

| | | |
|---|---|---|
| **Date of Birth:** | January 1, 1970 | |
| **Age:** | 52 | |
| **Race:** | White/Arabic | |
| **Hispanic Origin:** | Non-Hispanic origin | |
| **Sex:** | Male | |

| | |
|---|---|
| **SSN#:** | None |
| **FBI#:** | 749097NC2 |
| **USM#:** | 29166-016 |
| **State ID#:** | PDID#: 605-455 |
| **ICE#:** | A095807552 |

| | | |
|---|---|---|
| **Marital Status:** | Married | **PACTS#: 20468** |
| **Education:** | No HS Diploma or GED | |
| **Dependents:** | 0[1] | |
| **Citizenship:** | Afghanistan | |
| **Immigration Status:** | Paroled into the US for prosecution | |
| **Country of Birth:** | Afghanistan | |

| | |
|---|---|
| **Legal Address:** | None |
| **Residence Address:** | United States Penitentiary – Victorville, California |
| **Telephone#:** | None |

**Alias(es):**      [per NCIC]: Mohammed, Shinwari; Mohammed, Khan Shinwari

**Alternate IDs:**      [per NCIC]: FN-20026582
Alias DOB: 01/01/1975; 01/01/1971

**Restrictions on Use and Redisclosure of Presentence Investigation Report.** Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

---

[1] Based on IRS Publication 501 definition for dependent(s) to include qualifying child or relative. All identified children, whether or not a dependent of the defendant, are included in Part C of this report.

**MOHAMMED**, Khan

**PART A. THE OFFENSE**

**Charge(s) and Conviction(s)**

1.      On December 12, 2006, a federal grand jury returned a one-count Indictment against the defendant, Khan Mohammed, in the United States District Court for the District of Columbia. The Indictment charged the defendant with Distribution of One Kilogram or More of Heroin Knowing that the Substance Would be Unlawfully Imported into the United States, in violation of 21 USC § 959(a)(1), (a)(2), and 960(b)(1)(A).

2.      The Indictment provides notice to the defendant the Government intends to seek forfeiture as a part of the sentence, pursuant to 21 USC § 853.

3.      The criminal conduct charged in the Indictment occurred on October 18, 2006.

4.      On January 23, 2008, a two-count Superseding Indictment was filed against the defendant. The Superseding Indictment charges the defendant with the following: Count 1) Distribution of One Kilogram or More of Heroin Knowing that the Substance Would be Unlawfully Imported into the United States, in violation of 21 USC § 959(a)(1), (a)(2), and 960(b)(1)(A); and Count 2) Manufacture, Distribute, and Possess With Intent to Distribute One Kilogram or More of Heroin and Opium, Knowing and Intending to Provide Anything of Pecuniary Value to Any Person and Organization that has Engaged in Terrorist Activity and Terrorism, in violation of 21 USC § 960a, 841(a) and (b)(1)(A)(i).

5.      The Superseding Indictment provides notice to the defendant the Government intends to seek forfeiture as a part of the sentence, pursuant to 21 USC § 853.

6.      The criminal conduct charged in Count 1 of the Superseding Indictment occurred on October 1, 2006. Count 2 occurred from August 1, 2006, to October 29, 2006.

7.      On May 15, 2008, a jury returned guilty verdicts as to Counts 1 and 2 of the Superseding Indictment.

8.      On December 22, 2008, the defendant was sentenced to concurrent terms of life imprisonment on each count, followed by a 60-month term of supervised release per count, and ordered to pay a $200 special assessment.

9.      The defendant filed a timely appeal, and argued, in part, ineffective assistance of counsel. On September 4, 2012, the DC Circuit Court upheld the defendant's conviction and sentence but remanded the case for the Court to conduct an evidentiary hearing. On March 1, 2013, the defendant filed a Motion To Vacate His Conviction, Or In The Alternative For Resentencing, Based On Ineffective Assistance Of Counsel. The Court held an evidentiary hearing on December 3, 2015. On July 22, 2016, the Court issued a Memorandum Opinion finding that trial counsel's representation was not deficient, and that the defendant was not prejudiced by trial counsel's performance. The defendant appealed from that decision, and

the DC Circuit Court affirmed in part, vacated in part, and remanded the case for further proceedings. The DC Circuit confirmed the defendant's conviction for Count One. On

**MOHAMMED**, Khan                                                                    **Page 5**

December 9, 2021, the Court issued a Memorandum Opinion granting the Defendant's Motion to Vacate as to Count Two.

10.     Mr. Mohammed is currently incarcerated at US Penitentiary – Victorville, California. According to automated records of the Bureau of Prisons (BOP), he has incurred four disciplinary infractions during the period of incarceration. On February 28, 2011, he was found guilty of possessing unauthorized item and lost visitation privileges for 30 days. On August 6, 2012, he was found guilty of refusing a visual search and lost commissary privileges for 30 days, suspended pending 180 days of clear conduct. On December 23, 2014, he was found guilty of possessing unauthorized item (66 books of stamps found in food boxes in the defendant's locker) and lost email privileges for 30 days and visitation privileges for 15 days. On February 3, 2015, he was found guilty of refusing to obey an order and participating in an unauthorized meeting (defendant stated he was praying and was rushed by the officer to stop the prayer group) and lost visitation privileges for 60 days.

11.     Regarding educational courses, he participated in 3,152 hours of English as a Second Language and is deemed English proficient. He completed 131 hours of other courses, including GED Science, Arabic, Exploring Asia, Algebra, Independent Study – Life Math, Shakespeare, Spanish, and US History. His special assessment obligation has been satisfied. A DNA sample (VIP01582) was collected on May 23, 2011. A second sample (VIP02691) was collected on November 15, 2011. Since the defendant was sentenced to a term of life imprisonment, a projected release date was not applicable.

## The Offense Conduct

12.     The Offense Conduct section of this report was taken from documents and transcripts provided by the Government.

13.     In May 2006, Jaweed, an Afghan residing with his family in Peshawar, Pakistan was called to a meeting with Abdul Rahman, a member of the Taliban then residing in Peshawar. Abdul Rahman directed Jaweed to return to Afghanistan and obtain several rockets for the purpose of engaging in attacks on Westerners and US forces there, particularly at the Jalalabad Airfield. Located in Nangarhar Province, this airfield is maintained and used by US and coalition forces. Not wanting to participate but afraid to refuse Abdul Rahman's request, Jaweed told Abdul Rahman that he was unfamiliar with such things and would not know what to do. Abdul Rahman replied that this was not a problem, because he had a man in place in Nangarhar Province who could help him with obtaining the rockets and coordinate their use in attacks. He identified the man as Khan Mohammed.

14.     Jaweed knew both Abdul Rahman and Khan Mohammed from his youth, as they had all grown up in Garatek village, located in Chaprahar District, which is a subdivision of Nangarhar Province. In later years, Abdul Rahman joined the Taliban, and when the Taliban came to power, he became its head of investigations for Nangarhar Province. Another member of the Taliban from Garatek village was Habib Zai, who under the Taliban regime, was sub-governor of Nangarhar Province. Both men fled to Pakistan when the Taliban fell, and from there they actively coordinated attacks on the government, US/coalition forces and those collaborating with them.

15.     Fearing for the safety of his family should he refuse Abdul Rahman's "request," Jaweed agreed to return to Afghanistan. However, he determined that when he got there, he would contact the authorities to tell them about his assignment. On his return to Garatek, he was met by defendant Mohammed, by then an elder in the village who lived approximately 150 meters from Jaweed's home, who told Jaweed that he had already spoken with Abdul Rahman and knew about Jaweed's mission there. Defendant Mohammed told Jaweed that, being his first assignment, it would be Jaweed's responsibility to obtain the rockets, to build trust with the organization.

16.     Subsequent to this meeting, Jaweed reported his contacts with Abdul Rahman and Mohammed to Colonel Latif, the police chief for Chaprahar District. Latif subsequently brought him to the attention of a unit of agents with the US Drug Enforcement Administration (DEA), which happened to be posted at Jalalabad Airfield. Jaweed reported what had happened to him, as well as his prior knowledge of defendant Mohammed, particularly the fact that he had previously been involved in the manufacture and distribution of large quantities of opium. After interviewing Jaweed, the DEA asked him if he would be willing to return to defendant Mohammed, telling him that he had obtained the rockets as directed, and to see what defendant Mohammed had planned. Further, they asked him if he would record this conversation. Jaweed agreed.

17.     On August 18, 2006, Jaweed met with Khan Mohammed outside of defendant Mohammed's compound. During the recorded conversation, Jaweed reported that he had obtained the rockets. Defendant Mohammed proceeded to describe in some detail some of his prior acts of terrorism, as well as his plans for the rockets and his motivation for using them. A portion of the transcript of this meeting, introduced at trial as Exhibit 2A, reads as follows:

> Mohammed: I will also blow up the mines there. I have blown them up around the Dago Sar [Top of the hills] and blown them up around the Red Castle. The fact that you are my new associate, this is a secret between you and me. Then, God willing, there is money and everything in this. These are infidels we will kill them and we will continue our Jihad with blessing.

> Jaweed: Look! The fact that I agreed to this operation, I swear that I did this because of you. My friend, if you were not with me in here, I would not have done this work at all and I would have been working to earn my living. Based on the instruction of these people when they told me to work together with Khan Mohammed and I said Khan Mohammed is my long time friend. I said if Khan Mohammed keep my secret and I keep his secret...

> Mohammed: Yes...We will continue our action in our country. Whatever we do, here are a lot of [opportunities]. We can place and explode bombs and fire missiles toward the airport.

> Jaweed: Yes.

Mohammed: And to hit them with. This will be our Jihad and this will make us the [money] for our expenses.

Jaweed: What is the target of these people? The fact that they fire missiles to the airport, do they want to shoot the foreigners [Westerners] or the local people?

Mohammed: What they do is to kill the Americans. The Americans are infidels and Jihad is allowed against them. If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too. God willing, we and you will keep doing our Jihad.

18.     In addition to this, defendant Mohammed discussed previously having fired rockets at the office of the local police chief, and stated his intent to attack not only westerners, but elements of the Afghan government, and those who collaborated with them. Further, defendant Mohammed confirmed his relationship with Abdul Rahman and Habib Zai, saying that "our word are [sic] the same", and promised to obtain for Jaweed a position with the Taliban when it re-takes control of Afghanistan, in recognition of his assistance in conducting attacks.

19.     In subsequent recorded conversations between the two men, defendant Mohammed frequently discussed the subject of rockets and coordination of attacks with Abdul Rahman and Habib Zai. On one particular occasion, Jaweed was instructed to tell defendant Mohammed that the rockets he had obtained were stolen. Defendant Mohammed became angry, concerned about what Abdul Rahman and Zai would say if they found out, and discussing a means of obtaining replacement rockets so they would be ready when Abdul Rahman and Zai arrived to direct the attack.

20.     Based on the information they had learned concerning defendant Mohammed's prior experience in opium trafficking, on August 26, 2006, the DEA had Jaweed approach him for help in obtaining opium for a customer. In this and other conversations, defendant Mohammed confirmed his experience in the opium and heroin trade, volunteering that he would be able to obtain as much as 1,000 kilograms of opium should Jaweed and his customer need it.

21.     In part, the defendant's motivation to assist Jaweed was the prospect of earning commissions from Jaweed's customer. At one point, Jaweed explained that once he and Mohammed obtained the opium for the customer "there is three or four thousand [Pakistani Rupees] for me and you," to which Mohammed responded "[e]ven if there is two thousand, this will be enough." (Trial Exhibit 2D) Other conversations focused on the fact that after several successful drug deals, their deals would grow in size, with the prospect of larger and larger commissions. One of the things that defendant Mohammed indicated that the commission money could be used for would be to purchase a car "for business." (Trial Exhibit 2E) As discussed in an earlier conversation, defendant Mohammed anticipated using a car to move rockets, even discussing the right time of day to do this to avoid police checkpoints.

**MOHAMMED**, Khan                                                                                        **Page 8**

22.      After several recorded conversations concerning the opium deal, on September 11, 2006, defendant Mohammed met Jaweed at the Chaprahar Bazaar, located near their village, and proceeded to negotiate on Jaweed's behalf with several different opium sellers. Eventually, defendant Mohammed selected one with whom he had dealt with before, and, after negotiating the price and quality, reached an agreement. Jaweed gave defendant Mohammed some of the money he had been given by the DEA for a down payment, and defendant Mohammed gave this money to the seller.

23.      On September 14, 2006, defendant Mohammed led Jaweed to the seller's compound. There, in a videotaped meeting, defendant Mohammed inspected various pads of opium and had a discussion with the seller concerning their quality. After defendant Mohammed approved of the opium, the CS took delivery of 11 kilograms of it, and gave the balance due to defendant Mohammed, who paid the seller. This opium was subsequently submitted for testing by the DEA, which reported that the substance contained opium and had a gross weight of approximately 10.6 kilograms, of which 9.05 kilograms tested positive for opium.

24.      Subsequent to this deal, Jaweed, based on instructions from the DEA, reported to defendant Mohammed that his customer was very satisfied with the opium he had received, and that after converting it to heroin, had sent it to the United States and France. Jaweed then asked defendant Mohammed if he would be able to find any heroin for his customer, who intended to send it to the United States. Defendant Mohammed would later state that he was happy that it was going to America and that could obtain for Jaweed as much heroin as he needed.

25.      During this and other conversations, defendant Mohammed expressed his second motivation for assisting Jaweed in obtaining drugs- another means of pursuing jihad against non-Muslims, and more particularly, Americans. At one point, defendant Mohammed stated "[m]ay God eliminate them [infidels] right now, and we will eliminate them too. Whether it is by opium or by shooting, this is our common goal."

26.      On approximately October 15, 2006, the DEA provided Jaweed with $6,000, which he in turn provided to defendant Mohammed. On October 18, 2006, in a video-recorded meeting at defendant Mohammed's compound, he inspected two packages of heroin he had obtained, and he had a receipt drawn up for the sale. Jaweed was given the heroin, at which time he restated that it was intended for the United States. The balance of the money given to defendant Mohammed (the heroin was less than the $6,000 paid) was kept by him as a commission. The substance was turned over to the DEA agents, and subsequently sent to a DEA laboratory for testing, which confirmed that it was heroin, with a net weight of 1.981 kilograms.

27.      On October 29, 2006, the defendant was arrested by Afghan authorities who were working in conjunction with the DEA.

**Victim Impact**

28.      This is a Title 21 offense and there is no identifiable victim.

**MOHAMMED**, Khan                                                                **Page 9**

## Adjustment for Obstruction of Justice

29.     The Probation Office has not received any information to suggest that the defendant willfully impeded or obstructed the administration of justice during the course of the investigation, prosecution or sentencing of the instant offense of conviction.

## Adjustment for Acceptance of Responsibility

30.     The defendant went to trial in this case and was found guilty by a jury. The defendant is eligible for a decrease in offense level if he clearly demonstrates acceptance of responsibility for his offense; however, pursuant to USSG §3E1.1, comment. (n. 2), an adjustment under this guideline is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying essential factual elements of guilt. The note acknowledges that, in rare situations, a defendant may clearly demonstrate acceptance of responsibility for his criminal conduct even though he exercises his right to a trial when he asserts issues not related to factual guilt. In this case, the defendant did not appear to proceed to trial based on issues unrelated to factual guilt. Therefore, he does not appear to qualify for a decrease under this guideline provision.

## Safety Valve

31.     Pursuant to USSG §§ 2D1.1(a)(18) and 5C1.2, and considering the First Step Act of 2018, the probation officer has conducted the requisite analysis and determined the defendant does not qualify for statutory relief from the mandatory minimum at 18 USC § 3553(f) because the offense conduct included credible threats of violence and the defendant has not debriefed with the government.

## Offense Level Computation (2021 US Sentencing Guidelines)

32.     Count 1: Distribution of One Kilogram or More of Heroin Knowing that the Substance Would be Unlawfully Imported into the United States, 21 USC §§§ 959(a)(1), (a)(2) and 960(b)(1)(A)

33.     **Base Offense Level:** The defendant is accountable for at least 1.981 kilograms of heroin and 9.05 kilograms of opium. The guideline for 21 USC § 959(a)(1) offenses is found in USSG §2D1.1 of the guidelines. That section provides that an offense involving a converted drug weight of 2,433.5 kilograms has a base offense level of 30. USSG §2D1.1(a)(5) and (c)(5).                                                        **30**

| Converted<br>Drug Name | Drug Quantity | Drug Weight |
|---|---|---|
| Heroin | 1.981 kg | 1,981.00 kg |
| Opium | 9.05 kg | 452.50 kg |
| **Total** | | 2,433.50 kg |

**MOHAMMED**, Khan                                                                                   **Page 10**

34.                                                      **Specific Offense Characteristics:** None.
                                                                                                      **0**

35.      **Victim Related Adjustment:** The offense is a felony that involved, or was
intended to promote, a federal crime of terrorism; therefore, 12 levels are added. If
the resulting offense level is less than level 32, increase to level 32. USSG
§3A1.4(a).                                                                                            **+12**

36.                                                      **Adjustment for Role in the Offense:** None.
                                                                                                      **0**

37.                                                      **Adjustment for Obstruction of Justice:** None.
                                                                                                      **0**

38.                                                      **Adjusted Offense Level (Subtotal):**
                                                                                                      **42**

39.                                                      **Chapter Four Enhancement:** None.
                                                                                                      **0**

40.      **Acceptance of Responsibility:** The defendant proceeded to trial in this case
and as
of completion of the presentence investigation, the defendant has not clearly
demonstrated acceptance of responsibility for the offense. USSG §3E1.1.                               **0**

41.                                                      **Total Offense Level:**
                                                                                                      **42**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

42.      None.

### Adult Criminal Conviction(s)

43.      None.

### Criminal History Computation

44.      The total criminal history score is zero. According to the sentencing table in USSG
Chapter 5, Part A, a criminal history score of zero establishes a criminal history category
of I.

45.     The offense is a felony that was intended to promote a federal crime of terrorism; therefore, the criminal history category is VI. USSG §3A1.4(b).

**Traffic Infractions – Excluded Convictions**

46.     None.

**Other Criminal Conduct**

47.     None.

**MOHAMMED**, **Khan**                                                    **Page 11**

**Pending Charges**

48.   None.

**Other Arrests**

49.   None.

**PART C. OFFENDER CHARACTERISTICS**

**Personal and Family Data**

50.   The information contained in this section was obtained during an interview with the defendant and defense counsel on July 15, 2008, utilizing the interpreting services of M. Naim Saidi. Per the Court's direction, of the following biographical information in this report was not updated from the original report, prepared and finalized on December 15, 2008.

51.   Khan Mohammed is a 52-year-old man[2] who was born in Chaprahar District, Nangarhar Province, Afghanistan. He is one of 14 children born to his father, Gula-Jan. The defendant's father passed away approximately 10 years ago, as the result of kidney disease. The defendant indicated that his father was a landowner and the chief of their village in Afghanistan. The defendant's mother is Taj Waro, age 65. She resides in Chaprahar, Afghanistan, at the defendant's residence.

52.   According to the defendant, he has one half-brother, Bismillah, age 50, who resides in Chaprahar and is employed as a principal of the local high school. A second half-brother, Velayat Khan, was killed in an explosion in Afghanistan during the Russian invasion. Mr. Mohammed also has eight sisters, two half-sisters, and one sister who is deceased. Three of the defendant's sisters reside at his residence in Afghanistan. They are: Zahoor Jana, Manaza, and Zahidah.

53.   The defendant advised that he was raised in an intact, lower-middle class family in Afghanistan. He stated that his father was a landowner and a farmer, and although they were not rich, they always had food to eat and clothes to wear. Mr. Mohammed indicated that the children in the family did not always have shoes, and would often go barefoot. He advised that tribal feuds were very common in his village.

54.   Mr. Mohammed married his wife, Zahidah, age 30, approximately 16 years ago, when she was 14 years old. The couple has a total of seven children. Rafi-Ullah, age 14, and Belal, age 4, are the defendant's sons. Najmah, age 13, Franazah, age 11, Tajallah, age10, Devah, age 9, and Brishnah, age 3, are the defendant's daughters.

The defendant indicated that he does not know his date of birth. NCIC records show that the defendant has the following dates of birth: January 1, 1970, January 1, 1971, and January 1, 1975.

**MOHAMMED**, Khan                                                    **Page 12**

55.     Through the interpreter, the defendant made the following statements. "I support 12 members of my family. If I am kept here, their lives will be ruined. In Afghanistan, women do not come out from the home. They do not work outside the home. I do not know who is supporting them. I did not do anything illegal against the Americans or the American Government. The American officials and the persons who have a feud with me have treated me poorly. Even if I'm sentenced to one day, in my opinion, it is a lot. The Government, the Judge, and my other enemies will be responsible for that. I ask the Judge to send the Government people to me. If they want to dismember me, I will not say no. Even if they confiscate all my property in Afghanistan, I wouldn't mind. I just cannot afford to stay here in jail. I would like the Judge to set up a meeting between me and the Government. I don't want to leave my family alone."

## Physical Condition

56.     The defendant is 5 feet 8 inches tall and weighs 150 pounds. He has black hair and brown eyes. The defendant has a scar on the back of his head from a childhood accident. Mr. Mohammed indicated that he is in fair physical health. Records from the DC Jail revealed that he tested positive for tuberculosis, and is being treated with isoniazid and pyridoxine through August 16, 2008. While incarcerated, the defendant had a thyroid mass removed from his neck and suffered from a stomach ulcer. The defendant went on a hunger strike from June 12, 2008 until June 20, 2008. As a result, he is currently receiving a double food portion at every meal due to his poor physical condition.

## Mental and Emotional Health

57.     The defendant stated he has never suffered from, or been treated for, any mental or emotional health problems. He reported he never sought the professional assistance of a counselor, a psychiatrist, or a psychologist. He indicated that his sister, Zohor, suffers from a mental disability.

58.     DC Jail records indicated that the defendant was diagnosed with major depressive disorder, recurrent, severe without psychosis. He is taking omeprazole for the condition.

## Substance Abuse

59.     Mr. Mohammed denied a history of alcohol or drug use.

## Educational, Vocational and Special Skills

60.     The defendant stated that he attended school in Chaprahar, for "two months" approximately twelve or thirteen years ago. He has no other formal schooling.

## Employment Record

61.     At the time of his arrest the defendant was employed. He will be unemployed, due to incarceration, at the time of sentencing.

**MOHAMMED**, Khan                                                                                                 **Page 13**

62.     According to the defendant, he has been a vegetable farmer since childhood. He stated that he owned a farm in Afghanistan, and also farmed land for others for a share of their profits. Mr. Mohammed advised that his income varied from season to season, and he usually earned just enough money to support his family.

### Financial Condition: Ability to Pay

63.     The defendant advised that he and his siblings inherited a home and land in Afghanistan from their father upon his death. He reported no other assets. The defendant is represented by appointed counsel.

64.     Upon review of the defendant's financial profile, he does not appear to have the ability to pay a fine.

### PART D. SENTENCING OPTIONS

### Custody

65.     **Statutory Provisions:** The minimum term of imprisonment is 10 years and the maximum term is life for this Class A Felony. 21 USC §§§ 959(a)(1), (a)(2) and 960(b)(1)(A)

66.     **Guideline Provisions:** Based upon a total offense level of 42 and a criminal history category of VI, the guideline imprisonment range is 360 months to life.

### Impact of Plea Agreement

67.     The defendant proceeded to trial in this case.

### Supervised Release

68.     **Statutory Provisions:** A term of supervised release of at least five years is required. 21 USC §§§ 959(a)(1), (a)(2) and 960(b)(1)(A).

69.     **Guideline Provisions:** A five-year term of supervised release is required. USSG §5D1.2(c).

70.     If a sentence of imprisonment of one year or less is imposed, a term of supervised release is optional. USSG §5D1.1(b). Supervised release is required if the Court imposes a term of
    imprisonment of more than one year or when required by statute. USSG §5D1.1(a).

71.     In the case of a deportable alien who will likely be deported after imprisonment, the court should not ordinarily impose of term of supervised release unless required by statute. USSG §5D1.1(c). However, a term should be imposed, if the court determines a term of supervised release would provide an added measure of deterrence and protection due to the circumstances of the case.

72.     In addition to the mandatory and discretionary conditions of supervision, 18 USC § 3563(a) and (b), the Court may impose other conditions as they relate to the nature and

circumstances of the offense and the history and characteristics of the defendant. 18 USC § 3553(a)(1).

73.     In consideration of the above, the Court may impose the following additional condition: (a) deportation compliance.

74.     The probation office researched available national programs within the Bureau of Prisons (BOP) and recommends the defendant participate in the following during the period of incarceration:

75.     <u>Bureau Literacy Program</u>: This program assists inmates in the development of the foundational knowledge and skills in reading, math and written expression, and to prepare inmates to get a General Educational Development (GED) credential. All inmates without a GED credential or a high school diploma are enrolled in literacy classes in Bureau correctional facilities, unless: pretrial inmates; inmates committed for purpose of study and observation under the provisions of 18 USC 4205(c), 4241(d), or, effective November 1, 1987, 18 USC 3552(b); sentenced deportable aliens; or inmates determined by staff to be temporarily unable to participate in the Literacy Program due to special circumstances beyond their control. All Bureau facilities offer the Literacy Program.

76.     <u>Occupational Education Program</u>: This program is designed to help inmates acquire marketable skills in a wide variety of trades. Programs vary from institution to institution and are provided by either career civil-service vocational training instructors or through contracts with colleges and technical schools. All inmates are eligible to participate in an institution's occupational education program. The inmate's unit team, in consultation with the Education Department, determines if a particular course of study is suited to the inmate's needs. Occupational education programs typically require an inmate to have a GED or high school diploma or concurrent enrollment in the Literacy Program. All Bureau facilities are mandated to offer Occupational Training except for metropolitan correctional centers, metropolitan/federal detention centers, the Federal Transfer Center, satellite camps, and the administrative maximum facility.

**<u>Probation</u>**

77.     **Statutory Provisions:** The defendant is not eligible for probation because the instant offense is a Class A felony and probation has been expressly precluded by statute. 21 USC §§ 960(b)(1)(A) and 18 USC 3561(a)(1) and (2).

78.     **Guideline Provisions:** The defendant is not eligible for probation because the instant offense is a Class A felony for which probation has been expressly precluded by statute. USSG §5B1.1(b)(1) and (2). Additionally, since the applicable guideline range is in Zone D of the Sentencing Table, the defendant is ineligible for probation. USSG §5B1.1, comment.(n.2).

**<u>Mandatory Drug Testing</u>**

79.     The Violent Crime Control and Law Enforcement Act of 1994 requires an individual under supervision, whose offense occurred after September 13, 1994, refrain from the unlawful

**MOHAMMED**, Khan                                                                **Page 15**

use of a controlled substance; submit to one drug test within fifteen days of the commencement of supervision; and two additional periodic drug tests. The condition for mandatory drug testing may be ameliorated or suspended by the Court if reliable sentencing information indicates a low risk of future substance abuse by the defendant. 18 USC §§ 3563(a)(5) and 3583(d).

### DNA Requirement

80.     Pursuant to 42 USC § 14135a(a)-(d), for all felony offenses, the defendant shall submit to the collection and use of DNA identification information while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office[3].

### Fines

81.     **Statutory Provisions:** The maximum fine is $4,000,000. 21 USC § 960(b)(1)(A).

82.     A special assessment of $100 is mandatory. 18 USC § 3013[4].

83.     **Guideline Provisions:** The fine range for this offense is $~~50,000~~25,000 to $4,000,000. If the defendant is convicted under a statute authorizing (A) a maximum fine greater than $250,000, or (B) a fine for each day of violation, the Court may impose a fine up to the maximum authorized by the statute. USSG §§5E1.2(c)(3), (c)(4) and (h)(1).

84.     In determining the fine amount, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests that the Court use a monthly cost of $3,688.00 for imprisonment, a monthly cost of $2,980.00 for community confinement, and a monthly cost of $371.00 for supervision.

### Denial of Federal Benefits

85.     **Statutory Provisions:** At the discretion of the Court, the defendant, having been convicted of a first drug distribution offense, shall be ineligible for any or all federal benefits for up to five years after such conviction. 21 USC § 862(a)(1)(A).

86.     **Guideline Provisions:** The Court, pursuant to 21 U.S.C. § 862, may deny the eligibility for certain federal benefits of any individual convicted of distribution or possession of a controlled substance. USSG §5F1.6.

---

[3] The defendant's DNA sample (VIP01582) was collected on May 23, 2011, and a second sample (VIP02691) was collected on November 15, 2011.

Case 1:06-cr-00357-CKK Document 421 Filed 04/08/22 Page 24 of 36

[4] According to BOP records, the defendant's special assessment has been paid or removed.

**MOHAMMED**, Khan                                                                                    **Page 16**

**PART E. FACTORS THAT MAY WARRANT DEPARTURE**

87.      Pursuant to the Sentencing Reform Act of 1984, the Court must select a sentence from within the guideline range unless the case presents atypical factors and then the Court can depart from the guidelines and impose a sentence outside of the prescribed range. The Sentencing Guidelines provide for departures in Chapter Five – Part H based on specific offender characteristics which can involve a range of considerations. Additionally, Chapter Five – Part K provides for departures based on other grounds which allow the Court to depart if an aggravating or mitigating circumstance exists that is not adequately taken into consideration by the guidelines. In this case, the Probation Office has reviewed the factors outlined in Parts H and K of the Chapter Five and has not identified any circumstances that are not adequately considered within the guidelines.

88.      Pursuant to 18 USC § 3553(a), the Court shall impose a sentence sufficient, but not greater than necessary, to reflect the nature and circumstances of the offense and the history and characteristics of the defendant; to promote respect for the law and to provide just punishment for the offense; to afford adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational/vocational training, medical care or other correctional treatment. As a result of the presentence investigation, the Probation Office has not identified any factors that would warrant a variance from the applicable guideline range based on the factors outlined in 18 USC § 3553(a).

89.      Present law requires an alien convicted of a federal offense who is sentenced to imprisonment serve the entire sentence (minus statutory good time and time served) before deportation. The defendant's present status precludes him from eligibility for participation in certain programs, or from other considerations as an inmate in the US Bureau of Prisons while serving the sentence for the instant offense.

90.      Title 18 USC § 3624(c) authorizes the US Bureau of Prisons, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part of the final months of that term, not to exceed 12 months, under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry to the community. In Lartey v. Department of Justice, 790 F. Supp. 130 (US District Court W/D LA 1992), the Court determined that the right to participate in pre-release programs only applies to prisoners that are being released to a community within the United States, thereby excluding deportable aliens.

**MOHAMMED**, Khan                                                                  **Page 17**

91.    The DC Circuit has ruled that a downward departure may be appropriate if the defendant's status as a deportable alien is likely to cause fortuitous increase in the severity of confinement. <u>US v. Smith</u>, 27 F.3d 649, (307 US App. DC 1994).


                                            Respectfully Submitted,

                                            **BRIAN D. SHAFFER**
                                            **CHIEF UNITED STATES PROBATION OFFICER**

                                            *Crystal S. Lustig*

                        By:    Crystal S. Lustig
                               Senior United States Probation Officer
                               (202) 565-1425


Approved:

                            2022.04.08
                            2022.03.11 14:3831:12
                            07 -05'0004'00'
Renée Moses-Gregory
Supervisory United States Probation Officer
(202) 565-1348

COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT JUDGE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA          : Docket No.: 0090 1:06CR00357-001

vs.                               :          Disclosure Date: March 11, 2022

**MOHAMMED, Khan**                                           **Page 18**

**ADDENDUM TO THE PRESENTENCE REPORT**
**UNITED STATES V. KHAN MOHAMMED**
**DOCKET NO.: 0090 1:06CR00357-001**

**DISCLOSURE AND OBJECTION CHRONOLOGY**

The presentence report was disclosed to counsel on March 11, 2022. The Government submitted the Receipt and Acknowledgment form on March 22, 2022, and the defendant and Defense Counsel submitted the Receipt and Acknowledgment form on March 29, 2022.

**OBJECTIONS**

**By the Government**
Counsel for the Government reviewed the report and no material/factual inaccuracies were noted. Additionally, Counsel for the Government submitted a response to the defendant's objections on April 7, 2022.

**By the Defendant**
The defendant and Defense Counsel reviewed the report and the following objections are unresolved and set forth for the Court's consideration:

Offense Conduct, Paragraphs 12 through 27: Defense counsel contends that the Offense Conduct should be based on the evidence at trial and the jury's verdict, as modified by the Court's vacatur of the narcoterrorism conviction. Instead, Paragraphs 12 through 27 of the 2022 presentence report (PSR) repeat and rely upon the same allegations that this Court has concluded are insufficient to support the narcoterrorism conviction because they rest upon the testimony of a witness reasonable jurors may have found to be unreliable had trial counsel presented available bias evidence. Op. at 18, 25–26; see Ex. A (redline showing minimal changes to description of the offense conduct as set forth in the December 2008 PSR and the 2022 PSR). After the Court's December 9, 2021, Memorandum Opinion, reliance upon that testimony for any reason is both legally untenable and unconstitutional.

Paragraphs 13 through 15 should be stricken. These paragraphs set forth the narrative of Jaweed's purported recruitment by Abdul Rahman, the alleged Taliban leader in Nangarhar Province, to procure rockets and advance the Taliban's terroristic objectives and of Jaweed's first meeting with Mr. Mohammed to discuss the plot to obtain rockets. This narrative is the product of Jaweed's trial testimony, which this Court found a reasonable jury could have discredited in light of the substantial evidence of bias effective counsel could have elicited at trial. Op. at 18. Without

Jaweed's flawed trial testimony, Mr. Mohammed's recorded statements do not connect him to the Taliban or to terrorism. E.g., Op. at 20 ("[T]hese words fail to link Defendant to the Taliban but rather, they portray Mr. Mohammed as being violent."); see also Mohammed I, 693 F.3d at 204 (same).

Paragraph 16 should be revised to exclude references of the alleged plot to procure rockets for the purpose of advancing the Taliban's terroristic objectives, for the reasons described above.

**MOHAMMED, Khan**                                                    **Page 19**

In Paragraph 17, the third sentence should be stricken. Again, the reference to Mr. Mohammed's purported "prior acts of terrorism" directly conflicts with the findings of fact and conclusions of law set forth in the DC Circuit's remand order and this Court's Memorandum Opinion vacating Mr. Mohammed's narcoterrorism conviction. See Op. at 19–20 (explaining that violent actions do not necessarily equate with terrorism). Likewise, the transcript portions should be stricken, as they are irrelevant without the context of Jaweed's flawed trial testimony.

Paragraphs 18 through 27 similarly confuse Mr. Mohammed's statements with Jaweed's interpretations of Mr. Mohammed's statements. These paragraphs purport to attribute direct statements to Mr. Mohammed whereas, in fact, his recorded statements were, as both the DC Circuit and this Court have explained, played for the jury, over the course of two days, as Jaweed narrated, explained, and interpreted the audio tapes with the assistance of a translator. Mohammed I, 693 F.3d at 197; Mohammed II, 863 F.3d at 888. As this Court has explained, at trial the government "repeatedly asked Jaweed 'to explain Mohammed's meaning, rather than [asking for] Jaweed's understanding of what Mohammed was telling him.'" Id. at 18 (quoting Mohammed II, 863 F.3d at 892). There are thus "numerous examples" of incriminating statements the government was able to attribute to Mr. Mohammed through Jaweed's testimony, id. at 20–21, including alleged facts described in these paragraphs.

Paragraph 18, for example, states that Mr. Mohammed "promised to obtain for Jaweed a position with the Taliban when it re-takes control of Afghanistan." But the District Court has expressly held that "Mr. Mohammed's connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government." Op. at 21. "Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words." Id.; see also Mohammed I, 693 F.3d at 204 ("[Jaweed] explained the recordings and provided context for them."); id. ("Jaweed's testimony arguably shaped how the jury understood Mohammed's words."); Mohammed II, 863 F.3d at 888 (explaining that "the government repeatedly asked Jaweed to clarify the meaning of exchanges between him and Mohammed" and reiterating that "Jaweed's testimony arguably shaped how the jury understood Mohammed's words."). Paragraph 18 also states that Mr. Mohammed "discussed previously having fired rockets at the office of the local police chief, and stated his intent to attack not only westerners, but elements of the Afghan government, and those who collaborated with them." But again, as both the DC Circuit and the District Court have explained, without Jaweed's testimony, there is no offense conduct involving terrorism: Jaweed testified that when Mohammed discussed blowing up mines around 'Dagosar' and 'the Red Castle' he was referring to government cars ... and that plans to 'fire missiles toward the airport,' referenced the Jalalabad airfield.... Jaweed's testimony arguably shaped how the jury understood Mohammed's words. Without the additional information Jaweed provided that Mohammed was discussing government targets, a juror conceivably could conclude that Mohammed was violent, but not a terrorist....Mohammed I, 693 F.3d at 204 (emphasis original); see also Op. at 20 ("[w]hile Mr. Mohammed does repeatedly mention Jihad and killing infidels, on their own, these words fail to link Defendant to the Taliban but rather, they portray Mr. Mohammed as being violent."). In light of the District Court's vacatur of the narcoterrorism conviction, Paragraph 18 should be stricken.

Moreover, as the District Court and DC Circuit have further explained, even statements directly attributable to Mr. Mohammed do not stand on their own. Rather, they were infected by the

**MOHAMMED, Khan**                                                    **Page 20**

government's chosen manner of presenting its case against Mr. Mohammed—through Jaweed."'[H]ad Mohammed's counsel also independently sown doubt as to Jaweed's credibility, the subtle distinction between Jaweed's actual testimony (about Mohammed's state of mind) and testimony to which Jaweed should have been confined (about what he understood Mohammed to mean) could have been significant.'" Op. at 18 (quoting Mohammed II, 863 F.2d at 892). Accordingly, paragraphs 19, 21, and 25 should be stricken for the same reasons.

> Probation Officer's Response: The Offense Conduct outlined in the presentence report was adopted by the Court as factual findings at the original sentencing hearing on December 22, 2008, and is unchanged. As noted by the government's response to the defendant's objection, the issue decided in the Court's December 9, 2021, Memorandum Opinion addressed the issue of prejudice and did not strike Jaweed's testimony from the record or make a factual finding that Jaweed's testimony was unreliable. The opinion notes the Court's "impression of Jaweed as a credible witness at trial." The Court is in the best position to determine how much weight should be given to testimony at trial. The report is unchanged.

Offense Level Computation, Paragraphs 32 through 41: Mr. Mohammed objects to the application of USSG § 3A1.4(a) for a felony involving or intending to promote a federal crime of terrorism (the "Terrorism Enhancement"), which would inappropriately add 12 levels to his base offense level of 30. 2022 PSR ¶ 35. Wholly absent from the 2022 PSR's offense level computation is any acknowledgement that Mr. Mohammed's narcoterrorism conviction under 21 USC §§ 960a, 841(a) and (b)(1)(A)(i) has been vacated.

Rather, the 2022 PSR suggests that the Court's vacatur of Mr. Mohammed's narcoterrorism conviction has no practical effect on the applicable offense level. It simply states, without explanation, that the Terrorism Enhancement applies because "the offense is a felony that or was intended to promote, a federal crime of terrorism." For the reasons described above and further below, this is incorrect.

The government bears the burden of demonstrating, by a preponderance of the evidence, that the adjustment applies. See United States v. Bapack, 129 F.3d 1320, 1324 (D.C. Cir. 1997). The Terrorism Enhancement could arguably be applied in two circumstances. Neither circumstance applies here given the post-conviction proceedings described above and the Court's December 9, 2021 Memorandum Opinion. The first requires that the offense itself constitute a federal crime of terrorism. USSG § 3A1.4(a); United States v. Fidse, 862 F.3d 516, 522 (5th Cir. 2017) ("an offense 'involves' a federal crime of terrorism only if the crime of conviction is itself a federal crime of terrorism") (internal quotation marks omitted; emphasis added). This basis for applying the enhancement is not present here because the Court has vacated Mr. Mohammed's narcoterrorism conviction, leaving only the drug-trafficking conviction. Accordingly, the Terrorism Enhancement cannot be applied on the basis that the offense involved a federal crime of terrorism.

The second basis upon which other Circuits have found that the Terrorism Enhancement can be applied is when the offense is "intended to promote" a federal crime of terrorism. USSG § 3A1.4(a); Fidse, 863 F.3d at 522. In other words, these Circuit Courts of Appeal have found that the enhancement can be applied where the defendant's "purpose is to promote a terrorist crime." United States v. Mandhai, 375 F.3d 1243, 1248 (11th Cir. 2004). As the Seventh Circuit has stated,

**MOHAMMED, Khan**                                                     **Page 21**

"[in] enhancing a defendant's sentence pursuant to § 3A1.4 where the defendant has not been convicted of a federal crime of terrorism, however, a district court must identify which enumerated federal crime of terrorism the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record." United States v. Arnaout, 431 F.3d 994, 1002 (7th Cir. 2005); see also United States v. Arcila Ramirez, 16 F. 4th 844, 855 (11th Cir. 2021) (holding that the District Court erred in applying the Terrorism Enhancement because it failed to make factual findings on the intent of the defendant and instead relied on the defendant's guilty plea).

Following this Court's Memorandum Opinion, it is impossible to find that Mr. Mohammed's purpose was to promote terrorism. The factual findings about Mr. Mohammed's intent are heavily— if not completely—reliant on Jaweed's flawed trial testimony and his improper interpretation of the intended meaning of Mr. Mohammed's recorded statements played at trial. See Op. at 20–21 ("Nor can this Court now disregard that the Government relied heavily upon Jaweed's testimony in order to obtain a conviction against Defendant."); Mohammed II, 863 F.3d at 892 ("Jaweed's testimony was the only evidence that linked Mohammed to the Taliban. It thus provided critical support for the narcoterrorism charge."). This testimony has been discredited as potentially unreliable and cannot—without other supporting evidence—serve as a basis to apply the Terrorism Enhancement. Cf. United States v. Ansberry, 976 F.3d 1108, 1123 (10th Cir. 2020) (reversing imposition of official victim enhancement under § 3A1.2 and remanding for consideration of whether "the facts immediately related to the offense of conviction support the enhancement"). Another court in this District addressed the evidence necessary to apply the Terrorism Enhancement without an underlying terrorism crime in United States v. Abu Khatallah, 314 F.Supp.3d 179, 198 (D.D.C. 2018). The court held that it could not credit the testimony of an unreliable witness who provided inculpatory statements about the defendant's connection to terrorism. Id. However, because the testimony in Abu Khatallah "[did] not stand alone as evidence of [the defendant's] intentions" and there was an additional body of evidence that spoke to the defendant's terrorist connections, the court applied the enhancement. Id. at 198–99.

This case is different. Jaweed's testimony stands alone as the sole evidence connecting the Defendant to the Taliban and terrorism. There is no additional body of evidence speaking to terrorist connections, as both this Court and the DC Circuit have unambiguously concluded over the course of approximately 10 years of post-conviction proceedings. See, e.g., Op. at 20 (explaining that Mr. Mohamed's recorded statements "own their own ... fail to link [him] to the Taliban"); id. at 21 ("The Court finds that Mr. Mohammed's connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government. Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words."); see also Mohammed I, 693 F.3d at 204 ("[Jaweed] explained the recordings and provided context for them."); Mohammed II, 863 F.3d at 888 ("The government repeatedly asked Jaweed to clarify the meaning of exchanges between him and Mohammed."). And crucially, the District Court and Court of Appeals have been equally clear that violent actions are not tantamount to terrorism. Mohammed I, 693 F.3d at 204 ("Without the additional information Jaweed provided that Mohammed was discussing a government target, a juror could conceivably conclude that Mohammed was violent, but not a terrorist...."); Op. at 19– 20 ("While Mr. Mohamed does repeatedly mention Jihad and killing infidels, on their own, these words fail to link Defendant to the Taliban but rather portray Mr. Mohammed as being violent.").

Without Jaweed's inculpatory statements about Mr. Mohammed or Jaweed's extensive substantive commentary about Mr. Mohammed's recorded statements, Op. at 20, there is no support for a factual finding—let alone by a preponderance of the evidence—that Mr. Mohammed intended to promote terrorism. Accordingly, the Terrorism Enhancement cannot be applied on this basis either. Because the Terrorism Enhancement cannot be supported under either potential theory, Mr. Mohammed respectfully requests that the 2022 PSR be amended to exclude the 12-point enhancement under § 3A1.4(a).

> Probation Officer's Response: Pursuant to USSG §3A1.4, "If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," a 12-level increase is warranted, and the defendant's criminal history category shall be increased to Category VI. Although the defendant's narcoterrorism charge (Count Two) was vacated, the defendant's conduct in this case warrants the 12-level adjustment because his offense of conviction was a felony that intended to promote a federal crime of terrorism. In the government's response to the objection, it is noted that it is not a requirement that the defendant's crime of conviction be an enumerated federal crime of terrorism. Government counsel noted that if the Court credits Jaweed's testimony, there is proof by a preponderance of the evidence that the defendant planned to use the money earned from his drug sales to purchase missiles to fire at US troops, intending to promote the crimes of narcoterrorism, in violation of 21 USC § 960a, and providing material support to a terrorist organization, in violation of 18 USC § 2339B. However, even if the Court chooses not to credit Jaweed's testimony, the audio recordings admitted at trial showed that the defendant talked about a plan to explode bombs and fire missiles at "the airport" to specifically target the Americans as "infidels." The report is unchanged.

> Should the Court agree with defense counsel regarding the 12-level adjustment, the defendant's total offense level would be 30 and his criminal history category would be I, yielding an advisory guideline range of 97 to 121 months, and a fine range of $15,000 to $4,000,000.

### ~~RECEIPT AND ACKNOWLEDGMENT OF~~
### ~~PRESENTENCE INVESTIGATION REPORT~~

~~This is to acknowledge that each of the undersigned has received and reviewed the Presentence Investigation Report (PSR) in the above-entitled case. The undersigned further acknowledges:~~

Supplemental Information by the Probation Office Paragraph 83 was amended to correct the fine range.

Respectfully Submitted,

**BRIAN D. SHAFFER**
**CHIEF UNITED STATES PROBATION OFFICER**

~~For the~~
~~Government~~

*Crystal S. Lustig*

~~(CHECK APPROPRIATE BOX)~~

By:     Crystal S. Lustig
          Senior United States Probation Officer

(202) ~~There are no material/factual inaccuracies therein.~~ 565-1425

~~( ) There are material/factual inaccuracies in the PSI report as set forth in the attachment herein.~~

~~**Prosecuting Attorney**~~                                                                 ~~**Date**~~

~~**For the Defendant**~~ APPROVED BY:

2022.04.08 14:31:40 -04'00'

Renée Moses-Gregory                    Date
Supervisory United States Probation Officer
(202) 565-1348

~~(CHECK APPROPRIATE BOX)~~

~~( ) There are no material/factual inaccuracies therein.~~

~~( ) There are material/factual inaccuracies in the PSI report as set forth in the attachment.~~

~~**Defendant**~~          ~~**Date**~~                          ~~**Defense Counsel**~~          ~~**Date**~~

~~**NOTICE OF OBLIGATION OF THOSE EXECUTING THIS FORM**~~

Pursuant to Rule 32(f)(1), those executing this form shall submit any material inaccuracies or disputes in writing by **March 28, 2022**, to Crystal Lustig fax number **202-273-0242**, by email in Portable Document Format (pdf) to Dcpdb_psi_documents@dcp.uscourts.gov.

Pursuant to Rule 32(f)(2), it shall be the responsibility of the Attorney for the Government and the Defense Counsel to provide each other with a copy of the objections at the same time the objections are submitted to the probation office.

**Note:** Whether or not this is a sealed case, the probation office never includes information about 18 USC § 3553(e) or USSG § 5K1.1.

The Presentence Investigation Report and this Receipt of Acknowledgment Form are not public documents.

| Summary report: Litera® Change-Pro for Word 10.10.0.103 Document comparison done on 4/18/2022 3:57:41 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** US v. Mohammed Revised PSR.pdf | |
| **Modified filename:** US v. Khan Mohammed Final PSR.pdf | |
| **Changes:** | |
| Add | 120 |
| Delete | 90 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 1 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 211 |