# EXHIBIT B

The Defendant objected.  In summary form, I would say that Mr. Jaweed, who was one of the Government witnesses, was not in Afghanistan at the time, therefore, there was no evidence of actual attacks.

The Court will leave the statement in.  Jaweed was called to a meeting with Rahman in Pakistan to coordinate attacks in Afghanistan.  Mr. Mohammed discussed having engaged in attacks and having done so on advice and orders of the Taliban, specifically, Rahman and Habib Zai.  The next objection relates to what is called the terrorism enhancement, 3A1.4 from the advisory sentencing guidelines.  The effect of that enhancement is to add 12 levels to the offense level, and it automatically places the criminal history category at a level six.

The definition of the enhancement is an offense -- it is a felony that involved or was intended to promote a federal crime of terrorism.  That's how the advisory sentencing guideline sets it out.  There are two elements related to this enhancement.  The first one -- requirement is that there be a federal crime of terrorism.  The Defendant concedes that Count 2, the colloquial called narco-terrorism would fit the description of a federal crime of terrorism.

The second, which is the contested issue, requires a specific intent requirement, namely, that the underlying felony, which would be the felony in Count 2, was calculated

in Afghanistan.

My conclusion, the specific factual predicate, based on the Defendant's own statements regarding his motivation and/or specific intent to engage in drug trafficking to affect the conduct of government by intimidation or coercion or to retaliate against government conduct, including its affect on civilian populations, is that he specifically intends to use the commission from the drug sales to purchase a car to facilitate attacks against U.S. and foreign forces in Afghanistan and the Afghani government and its official. And the sale itself of the drugs going abroad to U.S. cities he specifically intends and is motivated by the drugs' destructive powers on U.S. civilian populations as a means of violent jihad against Americans who have fighting forces in Afghanistan against the Taliban.

So, the Court concludes there's a factual predicate for the terrorism enhancement. There are a series of additional arguments relating to this enhancement which I'll address. There's an argument defense counsel makes variously that the standard of proof for this enhancement should be either beyond a reasonable doubt or at least clear and convincing evidence. There is a D.C. Circuit case, U.S. v. Long cited by the Government. The standard of proof for application of enhancements, even in extraordinary circumstances, with a substantial increase in the offense

level is preponderance of the evidence. Therefore, the Court will apply that standard of proof.

In the alternative, the Court finds that the factual findings are sufficient to meet the standard of clear and convincing evidence. Second, the Defendant argues that this enhancement violates the Sixth Amendment and that the Defendant has a right to a jury trial on this issue. There is no Sixth Amendment violation with judicial fact finding of sentencing factors as long as the fact finding doesn't increase the maximum lawful sentence. In this case the statutory maximum is a life sentence. Also, the guidelines are advisory.

The Defendant third argues that because the enhancement affects both the offense level and the criminal history category, it is a double application and it, therefore, is unconstitutional. The Court in regard to this enhancement -- the Court agrees with the Court's reasoning in the Awan case, and Meskini M-E-S-K-I-N-I, 319 F.3d 88 at 91. The Congress and the Sentencing Commission had a rational basis for concluding that acts of terrorism represent a particularly grave threat because of the dangerousness of the crime, terrorists are unique criminals regarding recidivism and will likely engage in some conduct again.

Terrorists represent a unique difficulty in rehabilitation. And there is a need to incapacitate the

doesn't apply to the Defendant for two reasons. First, in order to apply the Defendant must be, quote, less culpable than most other participates, unquote. The only participates are the Defendant and Jaweed, a confidential informant who can't be held criminally responsible.

The Defendant played a critical role in that he had past experience in drug trafficking and opium. He interviewed four possible sellers and chose one to buy from. He negotiated the price and quantity, inspected the opium, and gave his approval prior to the sale. Jaweed gave the money to the Defendant. The Defendant consummated the drug deal by paying the seller. Moreover, the Defendant was eager to consummate other drug deals involving both opium and heroin and was even interested in being involved in converting the opium to heroin. So, I'm going to conclude that this provision does not apply.

Having dealt with what would affect the advisory sentencing guidelines, irrespective of departures, which we can discuss at a later point. The offense level -- base offense is 32, the group -- the counts are grouped. If you apply the 3A1.4, it adds 12 points, which is 44, but it is treated as offense level 43. Based on the 3A1.4, it places him in a criminal history category six, although, it would have made no difference because category one would have placed him in the same position.

later a video recorder, and therefore, there is a record of the incriminating conversations between the Defendant and Jaweed. And there would be no reason for the Defendant not to be frank with Jaweed, as he had been sent by Rahman to carry out these attacks regarding the planned terrorist activities. The missiles and later sales of the 11 kilograms of opium, sales of two kilograms of heroin, which are all also on the video.

The Defendant stipulated that the Taliban was a terrorist organization. Evidence proved that the Defendant was a member of the Taliban in contact with two Taliban leaders, which I've described, living in exile in Pakistan, but still involved in terrorist activities in Pakistan. Rahman, I have described as the director of investigations in the Taliban government, and Habib Zai, also a leader in the former Taliban government, a sub-governor of a county other than Chaprahar county.

The Defendant had been contacted about Jaweed and the plan to procure missiles, and was expected to collaborate in the attack on the airport. The Defendant admitted on these tapes being in continuing contact with the Taliban in Pakistan, indicating that he both visited them in Pakistan and went with them in Afghanistan when they came to plan -- when they, Rahman and Habib Zai and others, came to Afghanistan to plan terrorist attacks on U.S. and NATO forces and the Afghani

since he was very careful to be -- to discuss only as much as he needed to.

The Defendant talked of having mines, mortars, warheads, bullets and others weapons which he kept hidden away from his compound, all to be used to engage in terrorist activities. The Defendant also expressed a support for violent jihad against infidels, killing Americans, eliminate the American infidels, attacking wherever American and foreign forces were stationed. He said, quote: It is the Taliban plan to eliminate the westerners. To get infidels out of the country. Need to get rid of infidels. Jihad is allowed religiously against infidels. And if a Muslim is on their side and gets shot, that is allowed also. Infidels need to be killed. Unquote.

The Defendant describes selling opium and heroin to be sold abroad, particularly in the United States, as another way of carrying out jihad. Drugs is another weapon in his arsenal to kill Americans. The DEA became concerned about allowing the Defendant actual access to any missiles or rockets, so Jaweed at their direction told the Defendant that the missiles that had been buried had been stolen. The Defendant was very upset and angry with Jaweed, and you can hear this in the recorded conversations.

They then moved on to having Jaweed buy the opium and the heroin, allegedly, of course on behalf of somebody

else with the help of the Defendant, who had been involved in drug trafficking before and knew the trade. I won't go over and repeat that evidence. But, as I've indicated, the idea of selling the drugs was also to get the car and various other things related to the terrorists.

I would also indicate that in terms of -- there was testimony that the sellers at the market don't have the drugs with them, they only negotiate with those that they know. So, I'm not sure who would have gone in that they necessarily would have -- the sellers would have sold to people they didn't know. At the same time Jaweed indicated, as these drug sales were discussed and going on between Jaweed and the Defendant, that he had found more missiles. And the Defendant indicated that he had a source for the warheads for these missiles.

The Defendant was waiting for the Taliban leaders to meet with them to plan the attack. He indicated in the recorded conversations that he, the Defendant, that their arrival had been delayed because they had needed to keep on the move, that is the Taliban leaders. When the Defendant was arrested, the Defendant had brokered the sale of the opium and heroin and was planning to attack with his missiles on the airport, not knowing that Jaweed was a confidential informant, but thinking that they now had some new missiles that they could use.

And if they weren't able to come up with more people to be involved in the attack on the airport, since he seemed to recognize that if only he and Jaweed were involved that they then would go ahead and attack the police station.

Although we only have the Defendant's statements about attacking government cars with mines and having other weapons, there's no reason to tell Jaweed this unless this was correct. I would also note that Rahman, the Taliban leader, told Jaweed that the Defendant was the person to help him plan the attacks. So, the Taliban sent him directly to the Defendant. This isn't Jaweed enticing the Defendant into getting involved with this.

There was an additional departure, 2D1.1, Note 14, a sentencing entrapment, which is a basis for a downward departure. The entrapment departure is described as a sentencing entrapment or sentencing factor. Manipulation occurs when a defendant, although predisposed to commit a minor lessor offense, is entrapped into committing a greater offense subject to greater punishment. And the Defendant argued that this started with missiles. Jaweed introduced the discussion of the drugs, opium and heroin, and Jaweed introduced America as the final destination.

When you look at the Application Note 14, which explains when this is used, it's considered a reverse sting, really, an operation in which a government agent sells or

were still there coming here to testify, and presumably were returning, and we used pseudonyms for both of them as part of this. I don't know whether that will continue into his confinement or would need to continue into his confinement for any length of time.

The Government has indicated, and I think to some degree it's speculative as to where he's going to be placed. I would say, again, that this is not just drug trafficking, it has the terrorist aspect of it, which makes it unique among criminals, even though he does not have a prior criminal record. There's a high likelihood of recidivism. It is difficult to rehabilitate in the usual sense, and obviously, the need to incapacitate is certainly something of concern.

In terms of the issue of the religious services, the Bureau of Prisons I think has a different approach to that, based on other cases that I've had. I won't speak at this point to it because I don't know what they will actually do. But they do make different arrangements in terms of giving access to the religious individuals that can come to the Bureau of Prisons.

I would also note that Agent Follis testified that two kilograms of heroin, in terms of the street value in the United States, would be $1.36 to $3.06 million. If you want to compare him to other drug dealers, he's not small time, even if he wouldn't have received the profits from the

sales in the United States. So, based on these additional conditions of request for departures, the Court will not in its discretion formally depart, I'll consider it as one of the factors.

I would say that sentencing is very difficult and probably the most difficult thing that a judge does, and requires very serious consideration. In my interactions with you, Mr. Mohammed, I found you to be intelligent and you're articulate. Such as your statements and your actions, I think, are deliberate. The audio and video reveals your thoughts and your beliefs. I think it's clear that you're a member of the Taliban. I think it's clear that you're a terrorist. You're also somewhat of an opportunist, but I think the terrorist aspect of it overcomes it.

Your statements reflect not only your Taliban ideology, your hostile feelings toward the present Afghani government, it's officials, and those who side with it. But also reflect your undiluted hatred of Americans, particularly. I mean, if Jaweed had not gone to Colonel Latif, you might very well have been the one to attack the Jalalabad airport and police station. You, of course, didn't know that Jaweed was not a Taliban sympathizer.

As for the opium and the heroin, you gleefully celebrated the prospective deaths of Americans plagued with drug abuse problems. And as Agent Follis testified, in 2006

outside versus inside. You will receive medical care as it has already been provided to you, and you obviously will need some additional care. It's going to be up to you whether you engage in any constructive programs while you're incarcerated.

I agree with the Congress and the Sentencing Commission that acts of terrorism and terrorists pose a particularly grave threat because of the dangerousness of the crime. And terrorists stand unique as criminals and therefore make it difficult in terms of sentencing because there's minimal likelihood of rehabilitation. I didn't hear it in your statement. The maximum likelihood of recidivism. There's also a great need to incapacitate.

I will also say, listening to the evidence, that the case is a product of extraordinary efforts by the DEA agents in a war zone. I think all of the factors, and all of them are important, but probably the most important is deterrence in this particular case, I think it's paramount.

And I have to say that two Afghanis from different walks of life, the farmer, Mr. Jaweed, and a law enforcement officer, Colonel Latif, I don't know what their real names are, showed great courage in bringing you to justice and in placing themselves and their families, because they had families at issue as well, and they made a choice, and they obviously thought about it. And we had testimony relating to some of that. They placed not only themselves but their